**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application of JAN KOUM for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Criminal Proceeding Against Remi Tessier and Dernier Etage SARL. | Case No. 25-mc-428 |

**MEMORANDUM OF LAW IN SUPPORT OF JAN KOUM'S**
**APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Page

INTRODUCTION ... 1

FACTUAL BACKGROUND ... 6

I. Jan Koum ... 6

II. Tessier Exercised Broad Control Over Projects ... 7

III. Tessier Defrauded Koum ... 10

IV. Tessier Obstructed Investigation into His Fraudulent Conduct ... 16

V. Koum Plans to Commence a Criminal Case Against Tessier in France ... 21

VI. Discovery Sought ... 22

LEGAL STANDARD ... 24

ARGUMENT ... 25

I. Koum's Application Satisfies The Statutory Requirements ... 25

II. The Discretionary Factors Favor Granting Koum's Application ... 28

CONCLUSION ... 31

## TABLE OF AUTHORITIES

Page(s)

### Cases

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017)....27, 29

*Ahmad Hamad Algosaibi & Bros. v. Standard Chartered Int'l (USA) Ltd.*,
785 F. Supp. 2d 434 (S.D.N.Y. 2011)....27

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings (Berlamont)*,
773 F.3d 456 (2d Cir. 2014)....27, 30

*In re Application of Accent Delight Int'l Ltd.*,
2016 WL 5818597 (S.D.N.Y. Oct. 5, 2016)....27

*In re Application of Consellior Sas*,
2017 WL 449770 (S.D.N.Y. Feb. 2, 2017)....27, 30

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998)....25, 26

*In re Bloomfield Inv. Res. Corp.*,
2018 WL 6418421 (E.D.N.Y. Dec. 6, 2018)....29

*In re China Constr. Bank (Asia) Corp. Ltd.*,
2023 WL 3791711 (S.D.N.Y. June 2, 2023)....27

*In re Del Valle Ruiz*,
342 F. Supp. 3d 448 (S.D.N.Y 2018), *aff'd*, 939 F.3d 520 (2d Cir. 2019)....25

*In re Doosan Heavy Indus. & Constr. Co.*,
2020 WL 1864903 (E.D.N.Y. Apr. 14, 2020)....31

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995)....29, 30, 32

*Fed. Republic of Nigeria*,
27 F.4th 136 (2d Cir. 2022)....27

*In re Furstenberg Fin. SAS*,
2018 WL 3392882 (S.D.N.Y. July 12, 2018)....30

*In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, 2025 WL 40783 (S.D.N.Y. Jan. 7, 2025)....29

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)....*passim*

*In re Kuwait Ports Auth.*,
2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021)....28

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Lugosch v. Pyramid Co. of Onondaga*,
435 F.3d 110 (2d Cir. 2006)....5

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015)....30, 31, 32

*In re Top Matrix Holdings Ltd.*,
2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ....27, 28

**Statutes**

28 U.S.C. § 1782.... *passim*

**Other Authorities**

*About*, Remi Tessier Design (last accessed Sept. 3, 2025), available at
https://www.remi-tessier.com/about/ ....1, 8

Alain Elkann Interviews (Feb. 13, 2022), available at
https://www.alainelkanninterviews.com/remi-tessier/....8

Michaela Cordes, *The Artisan Designer*, GG Magazine (Apr. 28, 2015), available
at https://www.gg-magazine.com/en/2015/04/der-zimmer-mann/ ....8

"The Penthouse: Distinctive Design by Rémi Tessier," Maybourne (last accessed
September 9, 2025), available at https://www.maybourne.com/en/about-
us/editorial/the-penthouse-distinctive-design ....8

**Rules**

Fed. R. Civ. P. 26(b) ....31

## INTRODUCTION

In this Petition, WhatsApp co-founder Jan Koum seeks discovery for use in contemplated future criminal proceedings in France against Remi Tessier and his company, Dernier Etage SARL.[1] Tessier holds himself out as a premier interior designer of luxury residences and yachts. As he has boasted, he "pull[s] rank among the world's most revered yacht interior designers."[2] He claims to be a trusted advisor and one-stop-shop for a select group of wealthy clientele. Ten years ago, Koum first hired Tessier based on those representations, and over the next decade, entrusted Tessier with multi-million-dollar residential and superyacht interior design projects. But behind Koum's back and unbeknownst to him, Tessier brazenly exploited Koum's trust to steal millions of dollars, fraudulently enriching Tessier through multiple rip-offs, schemes, and lies. Tessier created a system structured to allow—and mask—his fraudulent and abusive actions. This was deliberate, knowing, and intentional.

Koum first retained Tessier in 2015 to provide interior design services for a private residence in California. That project was the first in a long professional relationship. Over the following decade, Koum hired Tessier as lead designer on at least eight additional projects, including luxury residences in Atherton, CA, Malibu, CA, Manhattan, London, and St. Barts and two superyachts. Koum paid Tessier tens of millions of dollars for both his design services and for the procurement of furniture, fixtures, and other design elements from third-party merchants. By contract, Tessier was compensated with a fixed fee for his design services, as well as a contractual markup—typically 10-20%—on the price of items he purchased for Koum from third-party merchants. Tessier's contracts specified that the markup percentage would be based on the

---

1 "Tessier" refers to Remi Tessier and Dernier Etage SARL.

2 *About*, Remi Tessier Design (last accessed Sept. 3, 2025), available at https://www.remi-tessier.com/about/.

cost Tessier paid to merchants. Declaration of Sara Colorado ¶ 13 ("Colorado Declaration"),[3] Exs. 1, 5, 6 (Tessier entitled to "a fee of 20% *of the cost . . . of those goods*," or "a fee equal to 15% of the *standard goods cost*.") (emphases added).[4] Koum would learn later, however, that Tessier often lied about what he paid third-party merchants to grossly inflate his markups, pocketing the difference along the way.

Tessier took numerous affirmative steps that prevented Koum from learning about Tessier's schemes until recently. From the outset, Tessier demanded complete dominion and opacity over his dealings with merchants. Tessier insisted on maintaining the anonymity of his merchants under the guise of protecting the "source of his suppliers" which he dubbed his "commercial property." But in reality, Tessier was shielding and enabling his fraud. Koum had no access to merchants, the merchants' original invoices, or any record of the true cost of the goods and services Tessier acquired. Tessier controlled all communications and financial transactions, engineering a system in which Koum had no ability to verify the legitimacy or price of the goods and services purchased with Koum's money. Koum was forced to rely exclusively on Tessier's representations and the written invoices Tessier generated and submitted to Koum for payment.

When Koum hired a new chief financial officer, she began to conduct a review of Koum's accounts from a fresh perspective—including transactions involving Tessier. She found she was unable to properly assess Tessier's billings, given Tessier's longstanding secrecy, but noted several

---

3 The Colorado Declaration is provided by Sara Colorado, an employee of Koum who is familiar with the facts underlying this application, oversaw Koum's investigation into Tessier, personally reviewed thousands of Tessier's invoices and Koum's records, and has spoken to merchants, among other investigative steps. In her declaration, Colorado details Koum's relationship with Tessier, the findings of Koum's investigation into Tessier's fraud, and at least fifteen examples found to date of Tessier's fraudulent practices.

4 Colorado Decl. Ex. 1, ToC 7. Charges, Provision 7.9; Colorado Decl. Ex. 5, Provision 7.9; Colorado Decl. Ex. 6, ToC 7. Charges, Provision 7.9.

potential billing irregularities she would not expect to see in legitimate transactions. With suspicions raised, Koum dug further into Tessier's dealings. Ultimately, Koum uncovered clear evidence that, over the course of years, Tessier had deployed multiple schemes to rip off Koum and line Tessier's pockets. These included: inflating prices on purchases by tens of thousands of Euros that in the aggregate likely amount to tens of millions of Euros; substituting cheap and dangerous viscose carpets for hand-knotted environmentally friendly pashmina carpets; passing off knockoff furniture as bespoke creations; falsifying invoices to erase discounts; double-charging multiple clients for the same materials; misrepresenting currencies to take advantage of exchange rates and overcharge; and extracting secret kickbacks from merchants. As Koum uncovered additional evidence, it became clear that each of Tessier's tactics was deliberate, coordinated, and designed to cloak the fraud in a veneer of exclusivity and sophistication. Worse still, Koum learned he was not Tessier's only victim. On information and belief, Tessier has bilked, cheated, and defrauded other high-net-worth individuals to the likely tune of tens of millions of dollars.

In 2024, as Koum's suspicions continued to grow, he decided it was time to conduct a more systematic internal investigation. Although he had no access to Tessier's internal records or original invoices from merchants and suppliers providing goods to Tessier for sale to Koum, Koum attempted, as best he could with the limited information available, to piece together facts concerning some of the more suspicious transactions. To aid the investigation, Koum asked Tessier for records underlying Tessier's purchases from merchants. Despite Koum's repeated requests, Tessier refused to provide even the most basic documentation, such as underlying merchant invoices for all purchases made on Koum's behalf. In a few limited cases, Tessier begrudgingly produced what he claimed were "original" invoices—unaware that Koum obtained some invoices directly from merchants. The discrepancies between Tessier's documents and the

merchants' original records are indisputable: prices had been altered, discounts had been removed, and other irregularities and anomalies evidencing clear fabrication had been introduced. When Tessier learned that Koum was contacting merchants, Tessier sought to silence them, invoking confidentiality agreements, threatening retaliation, and pressuring them not to cooperate. Because of Tessier's prior and ongoing concealment and obstruction, Koum still does not know the full extent of Tessier's fraud.

Based on the evidence obtained to date, Koum intends to initiate criminal proceedings against Tessier in France, where Tessier resides and works. In those proceedings, Koum will assert criminal claims for fraud, breach of trust leading to embezzlement, and deception, to hold Tessier accountable for his misdeeds. Koum has retained experienced counsel in France and already gathered enough evidence to reasonably contemplate bringing those charges. But to prosecute them, and to understand more fully the extent of Tessier's unlawful scheme, Koum must obtain additional authentic merchant records—evidence that Tessier has refused to provide, that Tessier has claimed merchants cannot voluntarily give under their contracts with him, and that only compulsory process, in jurisdictions around the world including this Court, can reveal. Through Koum's exhaustive efforts, he has reached the end of what can be obtained without judicial intervention. And critically, what has been uncovered to date reflects only a fraction of Tessier's misconduct: the visible surface of a much deeper and pervasive fraud.

This Petition seeks narrowly tailored discovery from several of Tessier's New York-based merchants—"Subpoenaed Merchant-1," "Subpoenaed Merchant-2," "Subpoenaed Merchant-3," "Gallery-1," "Gallery-2," and "Gallery-3" (together, the "Merchants")[5]—from whom Tessier

[5] These Merchants are further defined in the Colorado Declaration. This Brief and the Colorado Declaration anonymize these entities in public filings to protect their privacy interests. As described herein, Koum believes the Merchants are yet more innocent victims of Tessier's fraud. *E.g. Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (court must consider

purchased art and furniture for several of Koum's projects. Through investigation, Koum has identified these Merchants as those within this District who supplied goods to Tessier for Koum's projects. Koum brings this application on notice to the Merchants. Koum has no reason to suspect these Merchants of any wrongdoing; instead, Koum believes that like himself, the Merchants have been unwillingly—and perhaps unknowingly—drawn into Tessier's unlawful schemes. Through this Petition, Koum seeks to serve subpoenas on these Merchants to obtain their documentation and testimony—free from Tessier's influence, obfuscation, and obstruction.

Before filing this petition, Koum made repeated, good-faith efforts to obtain the original merchant invoices from Tessier. Tessier not only refused to cooperate, but engaged in a cover-up to conceal the very information Koum sought by falsifying the few invoices he did provide. When Koum pressed for answers, Tessier devised an escape plan. Over the past two months, he has initiated steps to transfer his company to Monaco—a jurisdiction notorious for shielding wrongdoers from accountability. The timing is no accident; with scrutiny mounting, Tessier is scrambling to put himself beyond the reach of the law.

Koum is taking, and intends to take, additional legal steps in other jurisdictions to obtain evidence to support his contemplated criminal case in France. For example, on September 15, 2025, the French authorities executed a search of Tessier's office in Paris pursuant to an order obtained by Koum in Paris commercial court, seizing records related to Tessier's work on certain design projects for Koum. Fender Decl., Ex. 1. Similarly, Koum intends to file additional Section 1782 petitions in other U.S. district courts to obtain records from merchants located in those districts.

---

the "privacy interests of those resisting disclosure") (citation omitted). This petition refers to three of the requested subpoena recipients as "Subpoenaed Merchant-1," "Subpoenaed Merchant-2," and "Subpoenaed Merchant-3"; these have no relationship to Merchant-1, Merchant-2, and Merchant-3 referenced herein.

* * *

Koum does not pursue this matter for personal enrichment. Koum, the co-founder of WhatsApp, has the financial resources to absorb the losses from Tessier's crimes. And to the extent Koum recovers any funds in connection with Tessier's criminal prosecution, Koum intends to donate them to charity in France. What matters here is justice and accountability. Tessier was trusted with extraordinary authority, and rather than act with honesty and professionalism, he abused that authority for improper personal gain—assuming his wealthy clients like Koum would never detect his theft. Tessier was wrong, and he must now be held accountable. Otherwise, he will continue his deceitful pattern: gaining the trust of unsuspecting clients, controlling their funds and all merchant relationships, insulating himself from oversight, and enriching himself at their expense through fraud, trickery, and theft. Discovery from the Merchants is indispensable. Without it, the extent of Tessier's fraud will remain hidden behind the opacity he has so carefully constructed. With it, Koum can obtain additional key pieces of the puzzle and provide the French criminal court with a fuller set of records to expose Tessier's crimes.

## FACTUAL BACKGROUND

### I. Jan Koum

Jan Koum, the co-founder and former CEO of WhatsApp, was born and raised Jewish in a village outside Kyiv, in the then-Ukrainian SSR, in 1976. Colorado Decl. ¶ 4. Koum's father was a construction manager and his mother was a homemaker. *Id.* In 1992, soon after the Soviet Union's collapse, Koum and his mother immigrated to the United States due to Ukraine's politically turbulent and anti-Semitic climate. *Id.* Koum and his mother secured an apartment in California through government assistance. *Id.* There, Koum's mother worked as a babysitter and Koum cleaned a grocery store as a teenager to make ends meet, and they also received food stamps.

*Id.* When Koum's mother was diagnosed with cancer after she and Koum arrived in the U.S., they relied on her disability allowance to survive. *Id.*

By 18, Koum taught himself computer networking from manuals he purchased at used bookstores. *Id.* ¶ 5. Koum enrolled at San Jose State University while also working as a security tester at Ernst & Young. *Id.* In his senior year of college, Koum was offered a job as an infrastructure engineer at Yahoo. *Id.* He accepted and left college to work full-time. *Id.* A year earlier, Koum's father—who planned to join his family in California but was never able to—died in Ukraine. *Id.* ¶ 6. Koum's mother died of cancer in 2000. *Id.*

In 2009, Koum bought an iPhone and saw an opportunity: to create an app for the iPhone's App Store. *Id.* ¶ 7. Koum developed WhatsApp, a secure, global instant messaging application. *Id.* Five years later, Facebook acquired WhatsApp for $19 billion, making Koum wealthy beyond the wildest dreams of a poor immigrant child on government assistance. *Id.* Since then, Koum has donated hundreds of millions of dollars to philanthropic causes, including $556 million to the Silicon Valley Community Foundation, the area's largest charitable foundation; more than $27 million to relief efforts following Russia's 2022 invasion of Ukraine; and more than $2 million to The FreeBSD Foundation, which supports a free software operating system. *Id.* ¶ 8.

## II. Tessier Exercised Broad Control Over Projects

Remi Tessier is an interior designer based in France well-known for his work on luxury yachts and private residences. *Id.* ¶ 9. Tessier brags that he "pull[s] rank among the world's most revered yacht interior designers."[6] He has built his reputation by serving a small and exclusive group of high-net-worth clients around the world. *Id.* Tessier employs a team—including a CFO and project managers—who act at his direction, often serving as intermediaries for Tessier. *Id.*

[6] *About*, Remi Tessier Design (last accessed Sept. 3, 2025), available at https://www.remi-tessier.com/about/.

Promoting an image of discretion, sophistication, and reliability, Tessier has long positioned himself as a trusted advisor in the luxury design space—managing large-scale, multimillion-dollar interior design projects with putative integrity. *Id.* Tessier's stock in trade is ingratiating himself with rich and powerful people, seeking to build what reporters call his "international reputation."[7] In public interviews, Tessier has emphasized that "it's very important to demonstrate your integrity" because "relationships are more important than the money or the business."[8] He has even proclaimed that he does not work for "money," he works for "love, collaboration and doing something great."[9]

In or around 2015, Koum was introduced to Tessier after he was recommended by contacts in the yachting industry. Colorado Decl. ¶ 10. Shortly thereafter, Koum hired Tessier to provide interior design, furnishing, and decoration services for a residence in California. *Id.* That engagement marked the beginning of what appeared to be a fruitful and trusting professional relationship. *Id.* Over the course of their relationship, Koum retained Tessier as the lead designer on at least nine separate projects, including multiple residences across the United States and Europe and two superyachts, and relied on him to make design decisions and procure high-quality furnishings costing tens of millions of dollars. *Id.* ¶ 11.

From the outset, however, and unbeknownst to Koum, Tessier treated Koum not as a client but as a target. Tessier cultivated his image of discretion, exclusivity, and sophistication to gain Koum's trust while deliberately constructing a closed system that gave Tessier unilateral control

---

7 "The Penthouse: Distinctive Design by Rémi Tessier," Maybourne (last accessed September 9, 2025), available at https://www.maybourne.com/en/about-us/editorial/the-penthouse-distinctive-design (discussing Tessier's relationships with Larry Gagosian and Damien Hirst).

8 Michaela Cordes, *The Artisan Designer*, GG Magazine (Apr. 28, 2015), available at https://www.gg-magazine.com/en/2015/04/der-zimmer-mann/.

9 Alain Elkann Interviews (Feb. 13, 2022), available at https://www.alainelkanninterviews.com/remi-tessier/.

over design and procurement with zero oversight. *See id.* ¶ 12. In written agreements, Tessier insisted on being Koum's exclusive design consultant, controlling all selection, sourcing, and procurement of furniture, fixtures, and equipment ("FF&E"). *Id.* Under Tessier's imposed framework, Koum had no access to or direct contact with merchants, their pricing, or their invoices; some contracts even declared the "source of [Tessier's] Suppliers" to be off limits to Koum. *See id.* ¶ 12.

Under the agreements, Tessier was compensated in two ways. *First*, Tessier charged a significant fixed design fee paid over the course of the contracted project. *Id.* ¶ 13. *Second*, on most projects, Tessier was entitled to keep a markup of between 10-20% on the cost (excluding the cost of delivery) of FF&E procured on Koum's behalf. *Id.*; *see, e.g.*, *id.*, Exs. 1, 6 (providing that Tessier was entitled to a "a fee of 20% *of the cost . . . of those goods*") (emphasis added).[10] Over the course of several years, Koum repeatedly entered into contracts with Tessier, granting him significant autonomy and paying him significant sums for his work. *Id.* ¶ 14. As the relationship deepened, so too did Koum's trust in Tessier. *Id.* That trust became so extensive that Koum later retained Tessier without any written agreement at all for certain projects. *Id.* But across all projects—whether governed by contract or not—Koum's reasonable expectations remained the same. Based on their longstanding relationship (contractual and otherwise), Tessier's reputation as an elite design professional, and repeated representations that Tessier was acting as a trusted advisor, Koum reasonably believed that Tessier would act in *their* mutual best interest: charge Koum the actual price paid for goods, apply the contractual markup based on the price that was actually paid to merchants, and provide honest and professional services in all matters relating to both design and procurement. *Id.*

[10] Colorado Decl. Ex. 6, ToC 7. Charges, Provision 7.9; Colorado Decl. Ex. 1, ToC 7. Charges, Provision 7.9.

For many years, Koum had no opportunity to discover, or basis to believe, that the extraordinary trust placed in Tessier (not to mention tens of millions of dollars) was being exploited and abused. *Id.* ¶ 15. To the contrary, their relationship appeared to be mutually beneficial and rewarding, yielding redesigned private residences, custom-outfitted yachts, and many millions of dollars of payments to Tessier which Koum was led to believe were legitimate. *Id.* ¶¶ 11, 14. Unbeknownst to Koum, however, Tessier's entire system was designed to enable him to steal, over and over again. *Id.* ¶¶ 16–55.

## III. Tessier Defrauded Koum

Beginning in or around January 2024, Koum began to suspect that his nearly decade-long relationship with Tessier—created and fostered through apparent loyalty and professionalism—was, in fact, riddled with deception. Koum had hired a financial controller, who later became his chief financial officer, and she undertook a fresh review of Koum's accounts, including his transactions with Tessier. *Id.* ¶¶ 16–17. Despite the opacity of Tessier's system, the CFO identified a pattern of irregularities in the items Tessier procured and the prices he charged. *Id.* ¶ 17. Her questions led Koum to initiate a broader investigation into Tessier's billing practices, which revealed that for the better part of a decade, Tessier has engaged in brazen, sprawling, and secretive fraud against Koum, and potentially other clients as well. *Id.* ¶¶ 18–19.

Although the evidence available to Koum is limited by Tessier's secrecy and subsequent obstruction, what Koum has been able to obtain to date reveals that Tessier systematically abused his position to surreptitiously enrich himself at Koum's expense, employing numerous schemes to defraud Koum at every turn. *Id.* ¶¶ 20–55. Examples of Tessier's multi-front scheme are outlined below, but these constitute only the portion of Tessier's misconduct Koum has already uncovered. The Colorado Declaration details additional examples of Tessier's fraudulent practices, establishing a pattern and practice of double- or triple-dipping, fraud, and false invoicing that

together provides powerful evidence that Tessier's misconduct is pervasive and not episodic or intermittent. But because of Tessier's secrecy and obstruction, further evidence is necessary to better understand the extent of Tessier's fraud.

### A. Inflated Prices and Double-Dipping Markups

Because Tessier purchased FF&E on Koum's behalf and charged a contractual markup based on the price he reported to Koum, Tessier could pocket any difference by falsely claiming an item cost more than what he actually paid. Koum's investigation has revealed that in Tessier's invoicing, Tessier frequently artificially inflated the prices from what he actually paid to purchase items from merchants, and then applied his contractual markup on those inflated figures. *See id.* ¶¶ 20–30. In certain cases, Tessier simply applied arbitrary increases to the invoices he provided Koum—charging Koum far more than the actual cost Tessier had paid for the item—and then calculated and charged the contractual markup based on the inflated amount. *Id.* ¶¶ 22–25. Tessier therefore pocketed the difference of not one but two inflations—the increase in price and the increase in markup—a brazen double dip. *Id.* In other instances, Tessier received substantial trade discounts or preferred pricing from merchants, but failed to pass through or disclose those savings to Koum—once again, falsely claiming to Koum that an item cost far more than it actually had. *Id.* ¶¶ 21, 26–27, 30.

For example, Koum has obtained the original invoice from a merchant for a luxury chair Tessier had purchased for Koum in 2024. The invoice indicates that the merchant's original sale price was €12,690.00; Tessier paid €10,786.50 after receiving a 15% trade discount.[11] *Id.* ¶ 21. But rather than pass the discount on to Koum, Tessier defrauded Koum by sending an invoice that claimed Tessier had paid €17,000 as the chair's list price. Tessier *then* calculated and added the

[11] Colorado Decl. Exs. 8–9.

contracted-for 15% markup on top of that inflated price, ultimately billing Koum €19,550—more than €7,000 above what Koum *should* have been billed for the chair. *Id.* This scheme is illustrated in the charts below showing what Tessier *should* have billed Koum for this luxury chair on the left, and what Tessier *actually* charged Koum on the right.

| Proper Billing for Luxury Chair | |
|---|---|
| List Price (before discount) | €12,690.00 |
| Actual Price Paid (after 15% discount) | €10,786.50 |
| 15% Contractual Markup on Actual Price | €1,617.98 |
| Proper Final Invoice (vendor price + 15% markup) | **€12,404.48** |

| Tessier's Inflated Billing for Luxury Chair | |
|---|---|
| Inflated "Base Price" Used by Tessier | €17,000.00 |
| 15% Contractual Markup | €2,550.00 |
| Final Invoice to Koum (inflated base + 15% markup) | **€19,550.00** |

Tessier ran this inflation scheme on purchases both large and small. For example, in April 2025, Tessier manipulated prices and pocketed the difference for a routine order of everyday glassware. Tessier's invoices showed he bought 84 pieces of glassware for €1,731.[12] *Id.* ¶ 22. The authentic merchant invoice, which Koum later obtained directly, showed that Tessier had actually paid only €1,079.84—and for 96 items, not 84. *Id.* Tessier inflated the price by approximately €650, or more than 60%, before adding his 10% contractual markup on top of the already inflated figure, as reflected in the charts below. *Id.*

| Proper Billing for 96 Pieces | |
|---|---|
| List price | € 1,079.84 |
| 10% Contractual Markup | € 107.98 |
| Proper Total Invoice Amount (price paid + 10% markup) | **€ 1,187.82** |

| Tessier's Inflated Billing for 84 Pieces | |
|---|---|
| Inflated "Base Price" Used by Tessier | € 1,731.00 |
| 10% Contractual Markup | € 173.10 |
| Final Invoice to Koum (inflated base + 10% markup) | **€ 1,904.10** |

These are only two of numerous instances of inflated pricing that Koum has uncovered so far. *See id.* ¶¶ 20–30. This reflects a consistent pattern: Tessier systematically inflating prices on

[12] Colorado Decl. Exs. 10–11.

purchases, and then using his contractual markup as a multiplier to further amplify his fraud at every turn.

**B. Substituting Inferior Goods**

Koum has discovered that Tessier delivered inferior, cheaper substitutes disguised as premium goods all while charging top value, and pocketing the margin in price. *See id.* ¶¶ 31–34. For example, in early 2025, as part of a yacht project, Tessier represented that he ordered more than a dozen hand-knotted pashmina carpets on Koum's behalf for a total of €642,032 from a highly reputable French manufacturer.[13] *Id.* ¶ 32. Shipping records indicate that many of the carpets were from a lesser-known Italian manufacturer, and Tessier had doctored an invoice to make it appear that the carpets had been manufactured by the French company. *Id.* Worse, laboratory testing conducted by Koum revealed the delivered carpets were fakes, made of cheap synthetic materials that were hand-loomed or hand-tufted. Many carpets were made of viscose—a highly flammable material—using inferior construction methods that are less environmentally friendly, less durable, wear down more quickly, and lack the quality and longevity of authentic hand-knotted pashmina. *Id.* These inferior carpets were almost certainly purchased at only a fraction of the represented cost. Tessier invoiced Koum €642,032 for the much more expensive, higher-quality items, keeping the difference. *Id.* The true value of the inferior carpets is estimated at approximately €321,000, meaning Tessier stole approximately €321,000—i.e., 100% of the true value. *Id.*

Once again, Tessier's greed spanned the high and the low: he deployed the same tactic on far smaller purchases, showing the lengths he would go to cheat and steal. For example, in November 2016, Tessier represented he had bought for Koum 16 steak knives with luxury

[13] Colorado Decl. Exs. 28–30.

Palisander wood handles at €66 each, for a total of €1,056. *Id.* ¶ 33.[14] In reality, the knives delivered to Koum had handles made of a synthetic material known as ABS, and cost less than €35 each—dramatically cheaper than what Tessier claimed he paid. *Id.*

### C. Fraudulent Misrepresentation of Originals as "Custom" Pieces

Tessier also substituted knockoffs for supposedly "custom" items. *Id.* ¶¶ 36–38. He presented replicas of famous collectible goods as bespoke items that he had designed, charging Koum significantly more even than the genuine versions. *Id.* On one occasion, for example, in connection with the design of a yacht in 2019, Tessier invoiced Koum for two "custom" sofas at €28,900 each, plus €14,000 each for the fabric—€42,900 in total for each sofa.[15] *Id.* ¶ 37. Recognizing that Tessier's sofas were nearly identical copies of a well-known designer piece, Koum contacted that designer and confirmed that the original piece costs €20,580 each.[16] *Id.* Koum thus paid substantially more for inferior knockoffs destined to depreciate much more rapidly than their genuine, famously designed, counterparts. *Id.*

### D. Obfuscating Public Auction Purchases

Tessier added undisclosed mark-ups to purchases that he, on information and belief, made for Koum at public auctions. *Id.* ¶¶ 39–41. For example, Tessier provided Koum with a collectible lounge chair, claiming it cost Tessier €67,000.[17] *Id.* ¶ 40. Records from a public auction indicate this unique piece sold for just €48,100, including taxes and fees. As was his practice, Tessier *then* added his 15% contractual markup on top of the price. On information and belief, this allowed

---

[14] Colorado Decl. Exs. 31–32.

[15] Colorado Decl. Ex. 33.

[16] In addition to the fraud and deception surrounding the representation and billing for these sofas, Tessier's conduct raises trademark and copyright infringement concerns. While those issues fall outside the scope of the current investigation, they underscore the breadth of Tessier's misconduct and his disregard for the law.

[17] Colorado Decl. Exs. 34–36.

Tessier to double dip on a single transaction—once for the inflated price, and once for the contractual markup based on that inflated price—overcharging Koum more than €20,000. *Id.*

**E. Additional Fraudulent Practices**

Tessier's misconduct took other forms as well, exploiting every single step of the procurement process. These included the following schemes that Koum has identified to date:

| Proper Billing for Lounge Chair | |
|---|---|
| Price Tessier Paid at Auction | €48,100 |
| 15% Contractual Markup | €7,215 |
| Proper Total Invoice Amount (price paid + 15% markup) | **€55,315** |

| Tessier's Inflated Billing for Lounge Chair | |
|---|---|
| Inflated "Base Price" Used by Tessier | €67,000 |
| 15% Contractual Markup | €10,050 |
| Final Invoice to Koum (inflated base + 15% markup) | **€77,050** |

- **Exchange-Rate Manipulation**: Tessier took advantage of favorable exchange rates—invoicing items in Euros when they were actually purchased in U.S. dollars—to steal sums undetected. *Id.* ¶¶ 42–44.

- **Quantity Manipulation**: Tessier manipulated quantities of goods he purchased. For example, in 2016, he invoiced Koum for one slab of wood for a large dining table but actually purchased two slabs, using only one slab for Koum's project. *Id.* ¶¶ 46–48.[18] On information and belief, Tessier diverted the second slab to another client whom he likewise charged for the price of two slabs—collecting payment from two different clients for the same pair of slabs and ultimately profiting more than double what he paid the merchant. *Id.*

- **Merchant Kickbacks**: On information and belief, Tessier demanded secret kickbacks from merchants to whom he steered business, including one merchant who agreed to pay Tessier a 10% fee and/or provide free goods in exchange for future orders. *Id.* ¶¶ 49-50. On information and belief, Koum also understands that, in connection with his purchase of a Picasso painting from a gallery at Tessier's recommendation, Tessier demanded and the gallery ultimately paid Tessier $600,000 for arranging the sale—compensation never disclosed to Koum. *Id.* ¶ 53.

These tactics were premeditated, repeated, and designed to maximize Tessier's personal gain at Koum's expense.

[18] Colorado Decl. Exs. 40–41.

### F. Pattern of Predation

From the evidence uncovered to date, Tessier appears to have built his career on a system of deceit: cultivating trust, insulating himself from oversight, manipulating pricing and procurement, and converting every transaction into hidden profit. *See id.* ¶¶ 16–56. And, critically, the evidence obtained to date represents only the tip of the iceberg—a small fraction of the thousands of purchases Tessier has made on Koum's behalf over the past decade. *See id.* ¶ 55.

As Tessier's fraudulent practices have come to light, so too have other former clients who were likely victims of these same practices. *Id.* ¶ 57. On information and belief, at least two other former clients previously terminated their relationships with Tessier due to Tessier's fraudulent conduct, and one prominent merchant stated Tessier's shady business practices are an "open secret" among designers and merchants that operate in this luxury design market. *Id.* ¶¶ 52, 57.

## IV. Tessier Obstructed Investigation into His Fraudulent Conduct

Koum's investigation began with routine inquiry methods to Tessier, beginning with an October 2024 audit request from Koum's outside accounting firm for the underlying invoices from merchants. *Id.* ¶ 59; Ex. 44. Tessier responded by reproducing only the invoices that he had already provided to Koum on each project. When pushed by the accountants for the detailed backup that was needed for the audit, Tessier claimed he was having "IT" and "archive recovery" difficulties, and suggested it may not even be possible to provide this documentation. *Id.* ¶ 59; Ex. 45. Petitioner's counsel reiterated the request for underlying invoices in a June 2025 letter to Tessier, which he also rejected. *Id.* ¶ 60; Ex. 46. When Tessier refused to respond to these straightforward and reasonable requests—particularly from a longstanding and trusting client—Koum's concerns mounted. *Id.* ¶ 61.

Tessier was fully aware by this time that Koum had concerns regarding Tessier's pricing and billing practices, yet refused to cooperate with Koum's requests. If Tessier had nothing to hide

and had committed no wrongdoing, why would he not act with transparency and cooperate to prove his innocence? The answer is clear. Tessier understood that his scheme had been discovered and was trying to obstruct, impede, and avoid judgment day.

As Koum continued to press Tessier directly for information on what he had paid for, Tessier turned to more desperate means of concealment. *Id.* ¶¶ 62–71. Faced with these direct questions Tessier eventually produced what he claimed were the underlying merchant invoices for a few limited transactions. *Id.* ¶ 62. Those documents raised even greater concerns. *Id.* Unbeknownst to Tessier, Koum was also working to obtain copies of these invoices directly from merchants. *Id.* A side-by-side comparison revealed Tessier had materially doctored the true invoices, including by misrepresenting the prices charged. *Id.*[19]

For example, one invoice sourced directly from the merchant showed that Tessier received a 56% discount on items purchased for Koum. *Id.* ¶ 64. The purported underlying invoice Tessier provided to Koum, however, reflected only a 10% discount from the merchant and contained other glaring discrepancies, including that the doctored invoice was reduced to a single page, whereas the authentic invoice spanned two. *Id.* This crude alteration was a transparent (and poorly executed) attempt to cover up one of Tessier's schemes.[20] *Id.*

[19] The invoices appended to the Colorado Declaration redact the name of the merchants whose invoices Tessier doctored, in the interest of their privacy.

[20] Colorado Decl. Exs. 19, 48.

**Real Invoice - 56% Discount**

[redacted]

Rémi Tessier Design
Dernier Etage Sarl
4 rue de Ponthieu
75008 Paris, FRANCE

**Facture** 10. juillet 2025

| | | | |
|---|---|---|---|
| **No. facture** | **6436140** | **Date** | **06.01.25** |
| **No. client** | **4008736** | **n° de TVA** | **FR66348020207** |
| **Association** | | | |
| **Member no.** | | | |
| **gln-no.** | | | |

Vos Réferences!

| | | | | |
|---|---|---|---|---|
| No. commande: 5420500 | Expédition: | GED4453691 | Votre référence: |
| Date commande: 27.12.24 | Date livraison: | 06.01.25 | |
| N° de colis: 284036583180 | N° doc. externe: | PROJET TESSIER – M2 | |

| pos. | Article | Description | Quantité m | Prix unitaire | Montant total EUR |
|---|---|---|---|---|---|
| 1 | 10-10838-243 | Spirit | 4 Mètre | 94,90 | 379,60 |
| | PLATIN Discount 56% de 379,60 EUR | | | | -212,58 |
| | Montant de la position | | | | 167,02 |
| | N° de pièce: ZS683075 4,00 M | | | | |
| | HS Code: 55151990 | | | | |
| | Composition:: 35%Polyestre 25%Acrylique 25%Viscose 10%Coton 5%Lin | | | | |
| | Largeur: 140 | | | | |
| 2 | 10-19612-443 | Arles | 3 Mètre | 272,90 | 818,70 |
| | PLATIN Discount 56% de 818,70 EUR | | | | -458,47 |
| | Montant de la position | | | | 360,23 |
| | N° de pièce: ZS683075 4,00 M | | | | |
| | HS Code: 54078300 | | | | |
| | Composition:: 40%Viscose 22%Acrylique 15%Coton 14%Polyestre 9%Laine | | | | |
| | Largeur: 130 | | | | |
| | | Fracht / Freight | 1 | 22,90 | 22,90 |
| | | Fracht / Freight | 1 | 1,60 | 1,60 |

**56% Actual Discount**

[redacted]

**Page 2 of Facture 6436140 of 6. janvier 2025**

| | |
|---|---|
| **Total** | **527,25** |
| Frais d'expedition total | 22.90 |
| Supplément temporaire sur les frais de transport (+0%) | 1.60 |
| Net | 551.75 |
| **Total EUR HT** | **551,75** |

**Actual Total Price**

**Adresse expédition**
LAVAL SA
PROJET TESSIER – M2
+33 (0)6 43 10 17 68
20 Rue de la Corvée Manette
88350 LIFFOL LE GRAND, FRANCE

Délai paiement: Virement à 30 jours fin de mois
Frais de port: EXW

Exonération de TVA § 4 No. 1 (b) C.T.V.A.

**Doctored Invoice - 10% Discount**

[redacted]

Rémi Tessier Design
Dernier Etage Sarl
4 rue de Ponthieu
75008 Paris, FRANCE

**Facture** 6. janvier 2025

| | | | |
|---|---|---|---|
| **No. facture** | **6436140** | **Date** | **06.01.25** |
| **No. client** | **4008736** | **n° de TVA** | **FR66348020207** |
| **Association** | | | |
| **Member no.** | | | |
| **gln-no.** | | | |

Vos Réferences!

| | | | | |
|---|---|---|---|---|
| No. commande: 5420500 | Expédition: | GED4453691 | Votre référence: |
| Date commande: 27.12.24 | Date livraison: | 06.01.25 | |
| N° de colis: 284036583180 | N° doc. externe: | PROJET TESSIER – M2 | |

| Article | Description | Quantité m | Prix unitaire | Montant total EUR |
|---|---|---|---|---|
| 10-10838-243 | Spirit | 4 Mètre | 94,90 | 341,64 |
| Discount 10,00%, -37,96EUR | | | | |
| N° de pièce: ZS683075 4,00 M | | | | |
| HS Code: 55151990 | | | | |
| Composition: 35%Polyestre 25%Acrylique 25%Viscose 10%Coton 5%Lin | | | | |
| Largeur: 140 | | | | |
| 10-19612-443 | Arles | 3 Mètre | 272,90 | 736,83 |
| Discount 10,00%, -81,87EUR | | | | |
| N° de pièce: ZS683162 3,00 M | | | | |
| HS Code: 54078300 | | | | |
| Composition: 40%Viscose 22%Acrylique 15%Coton 14%Polyestre 9%Laine | | | | |
| Largeur: 130 | | | | |
| | Fracht / Freight | 1 Pièce | 22,90 | 22,90 |
| | Fracht / Freight | 1 Pièce | 1,60 | 1,60 |

MD Guest Bedroom 05 Sda

**10% Fake Discount**

| | |
|---|---|
| **Total** | **1 078,47** |
| Frais d'expedition total | 22,90 |
| Supplément temporaire sur les frais de transport (+7%) | 1,60 |
| Net | 1 102,97 |
| **Total EUR HT** | **1 102,97** |

**Inflated Price**

[redacted]

On another occasion, Tessier not only altered the prices but also rewrote portions of the text on the merchant's invoice. *See id.* ¶ 66. In the authentic version, the merchant noted that custom "seafastening"[21] was included at no additional cost. *Id.* In Tessier's doctored version, he re-typed the product information, changed the formatting, introduced a conspicuous typo ("Mounge" instead of "Lounge"), inserted a new line-item charge for seafastening, and inexplicably altered the invoice number. *Id.* He also removed the 20% discount that was applied. *Id.* The result was a fraudulent invoice riddled with obvious errors—proof that it was Tessier, not the merchant, who was deliberately fabricating documents wholesale to conceal discounts and inflate charges.

[21] "Seafastening" means to provide structural support to secure cargo onto a sea-faring vessel.



Real Invoice from Merchant

[redacted]

BILL TO:

REMI TESSIER DESIGN
C/O RENATO RODRIGUES
4 RUE DE PONTHIEU
75008 PARIS FRANCE

DATE: Feb 27, 2024

INVOICE #: 1332

Real Invoice Number

TERMS: 50% DUE TO BEGIN WORK. BALANCE DUE PRIOR TO SHIPPING. PAYMENTS VIA WIRE OR CHECK SENT TO BELOW ADDRESS.

| DESCRIPTION | | AMOUNT |
|---|---|---|
| (3) KLEIN BLUE SCHOLARS ROCK LAMPS . . . . . . . . . . . . CUSTOM AND UNIQUE CERAMIC "SCHOLARS ROCK" LAMPS REF: MD MAIN LOUNGE | $ | 36,000.00 |
| (2) WHITE SCHOLARS ROCK LAMPS . . . . . . . . . . . . . . CUSTOM AND UNIQUE CERAMIC "SCHOLARS ROCK" LAMPS REF: OD OWNER CABIN | $ | 24,000.00 |
| (3) JADE SCHOLARS ROCK LAMPS . . . . . . . . . . . . . . CUSTOM AND UNIQUE CERAMIC "SCHOLARS ROCK" LAMPS REF: 2 X LOUNGE AND OFFICE / 1 X BD CINEMA LOUNGE | $ | 36,000.00 |

"Lounge" Spelled Correctly

ALL LAMPS ABOVE

DESC: HANDMADE IN THE UNITED STATES BY [redacted]
PRICE: $12,000.00 USD EACH
DIMS: 50CM H X 25CM D
WIRING: BRONZE HARDWARE / EU ELECTRICAL / CUSTOM SEAFASTENING
GLAZES:

KLEIN WHITE JADE

Seafastening Included in Price

20% Discount

NOTES: Images for color and texture reference only. Ceramics are handmade; some variation in size, color, texture and glaze is to be expected.

LEAD TIME: 12-16 weeks

PAYMENTS: Deposit of $28,800 via wire to Chase received Feb 6, 2025. Balance ($48,000) paid via wire to Chase received April 30th, 2025

| | | |
|---|---|---|
| SUB TOTAL | $ | 96,000.00 |
| DISCOUNT (20%) | $ | (19,200.00) |
| TAX | | FOREIGN SALE |
| SHIPPING | | NOT INCLUDED |
| TOTAL | $ | 76,800.00 |
| DEPOSIT (PAID) | $ | 28,800.00 |
| BALANCE (PAID) | $ | 48,000.00 |

[redacted]



Doctored Invoice from Tessier

BALANCE BASED ON REVISED ORDER

[redacted]

BILL TO:

Remi Tessier Design
4 Rue de Ponthieu
75008 Paris France

DATE: FEB 27, 2025

INVOICE #: 1373

Fake Invoice Number

TERMS: 50% DUE TO BEGIN WORK. BALANCE DUE PRIOR TO SHIPPING. PAYMENTS VIA WIRE OR CHECK SENT TO BELOW ADDRESS.

| DESCRIPTION | AMOUNT |
|---|---|
| (3) KLEIN BLUE SCHOLARS ROCK LAMPS. . . . . . . . . . . . . Custom and unique ceramic "Scholars Rock" lamps REF: MD Main Mounge | $36,000.00 |
| (2) WHITE SCHOLARS ROCK LAMPS. . . . . . . . . . . . . . . Custom and unique ceramic "Scholars Rock" lamps REF: OD Owner Cabin | $24,000.00 |
| (3) JADE SCHOLARS ROCK LAMPS. . . . . . . . . . . . . . . Custom and unique ceramic "Scholars Rock" lamps REF: 2 x Lounge and Office / 1 x BD Cinema lounge | $36,000.00 |
| (8) SEAFASTENING. . . . . . . . . . . . . . . . . . . Per diagram provided | $5,330.00 |

"Mounge" Typo

Added Line Item and Extra Cost

ALL LAMPS ABOVE

DESC: Handmade in the United States by [redacted]
PRICE: $12,000.00 USD each
DIMS: 50cm H x 25cm D
WIRING: Bronze hardware / EU electrical
GLAZES:

KLEIN WHITE JADE

NOTES: Images for color and texture reference only. Ceramics are handmade; some variation in size, color, texture and glaze is to be expected.

LEAD TIME: 14 weeks

PAYMENTS:

Omitted Discount

| | | |
|---|---|---|
| SUB TOTAL | $ | 101,330.00 |
| TAX | | FOREIGN SALE |
| SHIPPING | | NOT INCLUDED |
| TOTAL | $ | 101,330.00 |
| DEPOSIT PAID | $ | 57,000.00 |
| BALANCE (DUE) | $ | 44,330.00 |

[redacted]

Tessier went even further in his efforts to obstruct and impede Koum's investigation and suppress the truth. When he learned that Koum had begun contacting merchants directly, Tessier attempted to dissuade the merchants from cooperating, invoking confidentiality agreements, making legal or financial threats, and pressuring merchants to withhold documents. *Id.* ¶¶ 68–71. One merchant who was never subject to a confidentiality agreement with Tessier spoke openly with Koum about his transactions with Tessier. *Id.* ¶ 69. Three days later, Tessier contacted the merchant directly and requested that it enter into a confidentiality agreement—for the first time in

their yearslong relationship. *Id.* Similarly, several merchants reported being unable to voluntarily provide information to Koum because Tessier instructed them not to cooperate with Koum's investigation. *Id.* ¶ 70. Tessier's message was clear: cooperation with Koum would come at a high cost.

Tessier has taken even more recent steps to obstruct accountability. Based on revised wire instructions and an updated company name and logo on Tessier's invoices, followed by a search of public records, Koum has learned that in July 2025, Tessier changed his company's name and sold the assets to a newly-formed Monaco entity that Tessier also manages. *Id.* ¶ 73. Tessier made this sale after becoming aware of Koum's investigation into Tessier's fraud. *See id.* Though Koum and Tessier still had active contracts together, Tessier did not inform Koum of this sale. *Id.*

## V. Koum Plans to Commence a Criminal Case Against Tessier in France

To hold Tessier accountable for his gross misconduct, Koum plans to initiate a criminal proceeding in Tessier's home country of France where he maintains his business operations (the "French Criminal Proceeding").[22] *See* Fender Decl.[23] ¶¶ 8–12. Koum has made significant progress toward initiating a criminal action, including by commissioning and conducting an investigation and hiring French counsel, who are preparing a criminal complaint. *Id.* In the contemplated criminal complaint, Koum anticipates asserting three charges under French law: fraud; breach of trust leading to embezzlement; and deception. *Id.* ¶ 10. Once filed, the complaint will prompt a judicial proceeding. *Id.* ¶¶ 14–15. Koum, as a civil party in the French Criminal Proceeding, will have broad participation rights, including the ability to provide evidence directly

---

22 Koum and Tessier are also parties to ongoing arbitrations in the United Kingdom in connection with certain interior design projects. This petition is separate from those proceedings, and Koum does not seek discovery here for use in the UK proceedings.

23 This enclosed sworn declaration is submitted by Pierre-Emmanuel Fender, a partner in Gibson Dunn's Paris office. Fender Decl. ¶1.

to the investigating magistrate. *Id.* ¶ 15. The magistrate will gather evidence and, if sufficient proof is established, refer Tessier to trial, where the court will consider the evidence, hear arguments from the Public Prosecutor and civil parties, including Koum and Tessier, and rule on both guilt and damages. *Id.* ¶¶ 16–20. Koum intends to file for an omnibus prosecution that seeks to hold Tessier accountable for his fraud on a global basis, including related to merchants outside France. *Id.* ¶ 21–24.

## VI. Discovery Sought

Koum submits this Section 1782 application to obtain evidence located in this District essential to prosecuting the French Criminal Proceeding. Koum's investigation has reached its limit without compulsory process. Koum initiated compulsory process in France on Monday by executing the seizure order. But materials recovered from that seizure will only tell one side of the story: evidence in Tessier's possession. To understand the fraud, Koum needs documentation from the merchants directly to compare. And despite engaging private investigators, retaining outside experts and counsel, and even contacting merchants directly, critical gaps remain. Colorado Decl. ¶¶ 74–82.

Koum therefore seeks narrowly tailored discovery from the six Merchants who have been drawn unwillingly into Tessier's schemes:

- **Subpoenaed Merchant-1:** Tessier purchased several items from Subpoenaed Merchant-1 for one of Koum's yachts. *See id.* ¶ 79. Tessier charged Koum more for the items than what Tessier paid the merchant. Subpoenaed Merchant-1's records and testimony will confirm the actual purchase prices, any discounts, and show whether Tessier concealed additional savings on purchases from Subpoenaed Merchant-1.

- **Subpoenaed Merchant-2:** Tessier purchased raw materials from Subpoenaed Merchant-2 and charged Koum double the true cost of those materials. *See id.* ¶ 81. Subpoenaed Merchant-2's records and testimony will demonstrate how Tessier manipulated quantities and diverted goods between clients to multiply his profits, providing direct evidence of Tessier's fraudulent billing practices. *Id.*

- **Subpoenaed Merchant-3:** Tessier purchased several pieces of furniture from Subpoenaed Merchant-3 for one of Koum's residences, charging €83,336.00. *Id.* ¶ 80. Koum has been unable to determine what Tessier actually paid Subpoenaed Merchant-3 for this furniture. *Id.* Subpoenaed Merchant-3's records and testimony will show the actual price, assisting Koum in determining whether Tessier artificially inflated the cost or concealed savings or discounts from Koum.

- **Gallery-1:** Tessier facilitated Koum's purchase of a painting from Gallery-1 for $7.8 million. *See id.* ¶ 78. Koum's preliminary investigation has revealed that Tessier secretly demanded and received a $600,000 kickback from the gallery in connection with the transaction. *Id.* Gallery-1's records and testimony will establish the true terms of the sale, including any undisclosed commissions or payments, and will provide critical corroboration of Tessier's self-dealing.

- **Gallery-2:** Tessier purchased two works from Gallery-2 on Koum's behalf, totaling nearly six million dollars, for display at a private residence and on a luxury yacht. *See id.* ¶ 75. Based on a preliminary investigation, which was aided by a well-respected and prominent art dealer (the "Art Dealer"), Tessier received undisclosed kickbacks totaling $637,000 in connection with these purchases. *Id.* For unexplained reasons, it appears that on at least one occasion, Tessier directed the gallery to make a payment to a British Virgin Islands ("BVI") entity; this entity is apparently controlled by a lawyer under investigation for tax fraud by the Department of Justice. *Id.* ¶¶ 76–77. Documents and testimony from Gallery-2 will confirm the actual purchase prices and whether Tessier diverted additional value for himself, and any rationale Tessier provided for directing wire payments to an offshore BVI entity.

- **Gallery-3:** Tessier purchased a piece of art on Koum's behalf through this merchant, charging Koum more than $600,000. Upon information and belief, the gallery confirmed that it gave Tessier a discount that does not match the price charged. *Id.* ¶ 82. Formal invoices, records, and testimony will provide clear evidence of Tessier's fraud.

Together, the Merchants' documents and testimony will provide third-party, contemporaneous evidence that is essential to the contemplated French Criminal Proceeding, which will seek to hold Tessier accountable for all the schemes he perpetrated across the world. *See* Fender Decl. ¶¶ 25–27. Any merchant's original records, including those from the Merchants located in this District, will be critical. The Merchants' records will corroborate Koum's existing evidence, fill gaps left by Tessier's obstruction, and allow the French magistrate to assess the broader scope of Tessier's fraud. *See* Snyder Decl. Exs. 1-6 (Subpoenas).

Koum has exhausted every avenue short of compulsory process. *See* Colorado Decl. ¶¶ 57–72. He has pored over the few documents Tessier agreed to provide, pressed him for answers, hired investigators, and even obtained some documents directly from merchants. *Id.* Those efforts revealed both Tessier's fraud and his cover up, but they also confirmed that critical evidence Koum contemplates using in the French Criminal Proceeding remains in the files of the merchants themselves. Discovery from the Merchants is therefore not merely helpful—it is essential.

**LEGAL STANDARD**

Section 1782(a) provides that a federal district court may order discovery for use in a foreign tribunal from persons residing or found in the court's judicial district. 28 U.S.C. § 1782. Section 1782 was designed "to liberalize the assistance given" to foreign tribunals. *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 453 (S.D.N.Y 2018) (citation omitted), *aff'd*, 939 F.3d 520 (2d Cir. 2019). Where the information sought is relevant, it is "presumptively discoverable . . . unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *In re Bayer AG*, 146 F.3d 188, 195–96 (3d Cir. 1998).

Section 1782(a) has three *prima facie* statutory requirements. *First*, the applicant must be an "interested person" in the foreign proceeding. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004). *Second*, the person from whom discovery is sought must reside or be found in this district. *Id.* *Third*, the discovery must be for use in a pending or reasonably contemplated proceeding in a foreign tribunal. *Id.* When those requirements are met, the decision to grant the request rests with the district court, whose discretion is guided by four factors: (i) whether the person from whom discovery is requested is a party to the foreign proceeding; (ii) the nature of the foreign tribunal, the character of the foreign proceeding, and the tribunal's receptivity to the federal court's assistance; (iii) whether the applicant is attempting to circumvent

discovery restrictions or policies of the foreign tribunal; and (iv) whether the discovery sought is unduly intrusive or burdensome. *Id.* at 264–65.

## ARGUMENT

This Application seeks discovery that will be central to Koum's claims in the French Criminal Proceeding: evidence of what Tessier *actually* purchased from the Merchants and at what price; communications about Koum; records of any secret incentives to Tessier; and additional evidence of Tessier's relationship with a shady BVI entity to which Tessier directed proceeds of his fraud. At present, with access primarily to Tessier's doctored information, Koum is missing material and relevant pieces to the fraudulent puzzle.

Koum's application satisfies each factor relevant to Section 1782 relief. This Court should grant the application in full.

### I. Koum's Application Satisfies The Statutory Requirements

This application easily meets Section 1782's *prima facie* statutory requirements. *See Bayer*, 146 F.3d at 193.

***1.* Interested Person.** Koum is an "interested person." He personally plans to initiate the French Criminal Proceeding against Tessier and Tessier's company. A complainant who intends to initiate foreign proceedings qualifies as an "interested person." *See Intel*, 542 U.S. at 259. Koum will have "significant procedural rights" in the French Criminal Proceeding, including the ability to provide evidence and "information in support of [his] allegations." *Id.* at 255; Fender Decl. ¶¶ 14–16, 19; *e.g. In re Application of Accent Delight Int'l Ltd.*, 2016 WL 5818597, at *1 n.1 (S.D.N.Y. Oct. 5, 2016) (recognizing complainant in French proceeding as an interested person). That suffices.

***2.* Target Residing Or Found In This District.** The discovery targets reside or are found within this District. The Merchants' websites or other public sources indicate they are all based in

Manhattan, *see* Snyder Decl. Exs. 7-13. *See Ahmad Hamad Algosaibi & Bros. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) (parties who "have offices and do business" within the district "reside" there).

***3.* Reasonably Contemplated Foreign Proceeding.** Koum intends to use the discovery obtained via this action in the French Criminal Proceeding. This proceeding is (1) adjudicative in nature; (2) reasonably contemplated; and (3) accepting of the discovery for applicants' use. *See In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *4 (S.D.N.Y. Jan. 16, 2020); *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017).

The French Criminal Proceeding is "adjudicative" because it will "determine the merits" of a dispute, *Fed. Republic of Nigeria*, 27 F.4th 136, 158 (2d Cir. 2022), via judicial factfinding. *See, e.g.*, *In re China Constr. Bank (Asia) Corp. Ltd.*, 2023 WL 3791711, at *1 (S.D.N.Y. June 2, 2023). Courts have consistently held that criminal proceedings under French law are adjudicative because "[u]nder French law, private entities have substantial participation rights in criminal proceedings and are permitted to call witnesses, file pleadings, and present arguments or evidence before the Magistrate Judge." *In re Application of Consellior Sas*, 2017 WL 449770, at *1 n.1 (S.D.N.Y. Feb. 2, 2017); *see also In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings (Berlamont)*, 773 F.3d 456, 461 (2d Cir. 2014) (analogizing to the French criminal system to uphold discovery for use in a Swiss criminal investigation). Once Koum files his complaint, an investigating magistrate must open a judicial investigation in which the magistrate gathers documentary evidence, questions witnesses, and rules on the parties' requests. Fender Decl. ¶¶ 14–18. The magistrate will then determine whether to refer the matter to formal trial. *Id.* ¶ 19. Both stages of this process involve judicial factfinding

and culminate in binding determinations of liability, punishment, and compensation. *Id.* ¶¶ 14–20.

***Second***, the French Criminal Proceeding is "reasonably contemplated." A proceeding need not be "pending" or even "imminent"—it is enough that "a dispositive ruling . . . be within reasonable contemplation." *Intel*, 542 U.S. at 259. This requires some "objective indicium" that an action is being contemplated, such as sworn statements attesting to a petitioner's intent to litigate and describing the legal theories on which it plans to rely in the foreign proceeding. *Top Matrix Holdings*, 2020 WL 248716, at *4 (citation omitted). The Fender Declaration, which confirms Koum's retention of local counsel, extensive investigation, initial preparation of a criminal complaint to trigger the French Criminal Proceeding, and identification of specific charges Koum will pursue, *see* Fender Decl. ¶¶ 5–12, is precisely the "objective indicia" that meets this standard. *See In re Kuwait Ports Auth.*, 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021).

***Third***, the discovery sought can be used in the French Criminal Proceeding. *See* Fender Decl. ¶ 21. As the French Criminal Proceeding will be an omnibus prosecution that seeks to hold Tessier accountable for his fraud on a global scale, evidence from all jurisdictions—not only France—will be relevant. By submitting this discovery, Koum will enable the investigating magistrate to assess the broader scope of Tessier's misconduct, ensure the matter is properly referred for trial, and present compelling proof to the trial court. The discovery will thus absolutely "serve some use in the proceeding." *In re Accent Delight Int'l*, 869 F.3d at 132.

* * *

This application therefore satisfies the *statutory* prerequisites to awarding Section 1782 relief.

**II. The Discretionary Factors Favor Granting Koum's Application**

The four discretionary factors the Supreme Court identified in *Intel* also weigh strongly in favor of granting Koum's application. *See Intel*, 542 U.S. at 264–65.

***1.*** **Not "Participants" In the Foreign Action.** The Merchants are based in the U.S. and will not be parties to the French Criminal Proceeding. *See* Fender Decl. ¶ 23; *Intel*, 542 U.S. at 244. The French investigating magistrate judge and trial court do "not have the jurisdiction . . . to obtain [their] testimony [or] any documents sought" from them without resorting to the cumbersome letters rogatory process. *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at *4 (E.D.N.Y. Dec. 6, 2018); *see also* Fender Decl. ¶ 24. Given this process "is extremely bureaucratic and time-consuming, and it can take years for its result to be presented," the first factor weighs heavily in favor of Koum. *In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, 2025 WL 40783, at *3 (S.D.N.Y. Jan. 7, 2025) (citation omitted).

***2.*** **Receptivity.** The second *Intel* factor assesses "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. "Absent specific directions to the contrary from a foreign forum, [Section 1782]'s underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995).

This second factor again strongly favors Koum. French trial courts are not only "receptive" to accepting evidence procured through U.S. discovery mechanisms; they do so on a regular basis. *See* Fender Decl. ¶¶ 29–32. U.S. courts have thus routinely granted Section 1782 applications for use in French proceedings, including criminal cases like the one Koum contemplates. *See, e.g.*, *Consellior*, 2017 WL 449770, at *2 (authorizing 1782 application for use in French criminal proceeding); *see also In re Furstenberg Fin. SAS*, 2018 WL 3392882, at *7 (S.D.N.Y. July 12,

2018) (granting same for use in criminal proceeding in Luxembourg, which has similar criminal system to France); *Berlamont*, 773 F.3d 456 at 461 (approving same for use in criminal proceeding in Switzerland, which has similar criminal system to France).

***3.*** **No Attempt to Circumvent Foreign Proof-Gathering Restrictions.** The third *Intel* factor examines "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Because Koum seeks discovery in a good-faith effort to obtain evidence that goes to the heart of his claims, without evading any restriction on evidence gathering, this factor also favors him. France has no law or policy that would bar evidence obtained from a Section 1782 proceeding, and indeed, French courts regularly accept and consider evidence obtained through such means. *See* Fender Decl. ¶¶ 28–32; *accord Euromepa*, 51 F.3d at 1101 ("Since no authoritative declarations by French judicial, executive or legislative bodies objecting to foreign discovery assistance appear in the record, we are unable to accept the [] conclusion that granting [a Section 1782] discovery request will in fact offend the people of France.").

***4.*** **Requested Discovery is Inaccessible, Relevant, and Not Unduly Burdensome.** The fourth *Intel* factor examines whether the request is "unduly intrusive or burdensome" through the lens of "the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015). The Court should thus consider "the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b).

Here, the discovery sought is essential to the French Criminal Proceeding but remains inaccessible to Koum. Tessier's stonewalling, obstruction, and confidentiality agreements have

meant that even after extensive effort, Koum has been able to gather only a fraction of original merchant invoices and payment records for Tessier's purchases on Koum's behalf. Cross-checking those few records against Tessier's submissions revealed clear evidence of fraud—such as inflated prices, concealed discounts, and undisclosed kickbacks—enough to support contemplated criminal charges in France. *See* Colorado Decl. ¶¶ 18–55. Additional authentic merchant records are critical to supporting those charges before the investigating magistrate in France, and will provide the French court with reliable, contemporaneous documentation essential to assessing Tessier's misconduct—evidence that Koum cannot otherwise obtain.

Koum's request is not overly burdensome. The narrow set of documents Koum seeks should be easily accessible to Merchants and the targeted evidence is within their control. *See* Snyder Decl. Exs. 1-6 (Merchants must provide only those documents in their "actual or constructive possession, custody, or control"). The request also "targets only documents and testimony" about specific communications and transactions between the Merchants and Tessier. *See In re Doosan Heavy Indus. & Constr. Co.*, 2020 WL 1864903, at *2 (E.D.N.Y. Apr. 14, 2020); Snyder Decl. Exs. 1-6, Attachment C (seeking only documents concerning transactions or interactions with RTD; communications with RTD; and communications about RTD).[24]

* * *

In sum, each discretionary *Intel* factor weighs strongly in favor of granting the application: the Merchants will not be parties to the French Criminal Proceeding; French courts are receptive

[24] In any event, the Second Circuit has instructed that even if "a district court finds that a discovery request is overbroad, before denying . . . [a Section 1782] application it should ordinarily consider whether that defect could be cured through a limited grant of discovery." *Mees*, 793 F.3d at 302; *see also Euromepa S.A.*, 51 F.3d at 1101 ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright.").

to U.S. discovery assistance; Koum does not seek to circumvent any restrictions with this request; and the discovery sought is neither unduly burdensome nor intrusive.

## CONCLUSION

For the foregoing reasons, Koum respectfully requests the Court grant this Application in its entirety and grant Koum leave to serve on the Merchants subpoenas substantially similar to those attached to the Snyder Declaration as Exhibits 1-6.

Dated: September 29, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Orin Snyder*

Orin Snyder
Darcy C. Harris
Lee R. Crain
Samuel L. Raymond
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-5303

*Counsel for Petitioner*

**WORD COUNT CERTIFICATION**

I, Samuel L. Raymond, an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 that this memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1 because it contains 8,713 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
September 29, 2025

*s/ Samuel L. Raymond*
Samuel L. Raymond