UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of JAN KOUM for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Criminal Proceeding Against Remi Tessier and Dernier Etage SARL. | Case No. 1:25-mc-00428-JPO |

**SUPPLEMENTAL DECLARATION OF PIERRE-EMMANUEL FENDER IN SUPPORT OF JAN KOUM'S OPPOSITION TO REMI TESSIER AND DERNIER ETAGE'S MOTION**

I, **Pierre-Emmanuel Fender**, pursuant to 28 U.S.C. § 1746, declare as follows:

### INTRODUCTION

1. I was admitted as an Avocat au Barreau de Paris in France in 2003 and am currently a Partner at the law firm Gibson, Dunn & Crutcher LLP, based in Paris, France.

2. I submit this supplemental Declaration in support of Jan Koum's Opposition to Remi Tessier's and Dernier Etage's Motion (the "**RTD Motion**"). In preparing this Declaration, I have reviewed Mr. Koum's Application for an Order Pursuant to 28 U.S.C. § 1782 (the "**Section 1782 Application**") and the subpoenas attached thereto; the RTD Motion; the Declaration of Leon Del Forno in support of the RTD Motion (the "**Del Forno Declaration**"); the Declaration of Hassan Khan in support of the RTD Motion (the "**Khan Declaration**"); and the Declaration of Thierry Marembert, filed contemporaneously with this Declaration.

3. Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by Mr. Koum, and my review of relevant documents. If called as a witness, I could and would testify competently regarding the information set forth herein.

1

## STATUS OF FRENCH PROCEEDINGS REGARDING SUPPLIER OUTREACH

4. I have reviewed the Khan Declaration, which makes certain statements about the current status of summary proceedings in France filed by Mr. Tessier and RTD on October 2, 2025 (the "**Supplier Proceedings**") and provides certain conclusions about French law. I am counsel to Mr. Koum in those proceedings, and I submit this Declaration to clarify the record. As an initial matter, I note Mr. Khan does not appear to be qualified to practice in France, and I do not believe has entered an appearance on Mr. Tessier's behalf in any proceedings in France. I am therefore unaware of any basis he has to opine on matters of French procedural or substantive law. Nothing in this Declaration should be taken as conceding or waiving any position on the merits of these issues, which are expressly reserved for determination in the proper forum: in France.

5. Mr. Khan fails to correctly describe the current status of the Supplier Proceedings. The Supplier Proceedings seek to prevent Mr. Koum from asking RTD's suppliers to provide information or documents. On October 27, 2025, Mr. Koum submitted, through my firm as his counsel, a written response to Mr. Tessier's allegations in the Supplier Proceedings. Among numerous other points, Mr. Koum's submission explained that the actions Mr. Koum and his agents took to contact merchants did not violate French law, because the only information Mr. Koum and his advisers sought is the actual cost or purchase price Mr. Tessier paid to merchants. That is *not* "commercially confidential information," Khan Declaration ¶¶ 36, 50, under the French Code *de commerce*, particularly where, as here, RTD *previously* shared similar information with Mr. Koum. Mr. Koum's submission also rebutted Mr. Tessier's other arguments. One of those arguments was that Mr. Koum's conduct violated the French Blocking Statute. Khan Declaration ¶ 34. As I argued in the Supplier Proceedings, this argument is wrong: the Blocking Statute prevents certain evidence obtained in France from being used in foreign proceedings. It does not apply to the opposite circumstance where

evidence obtained outside France will be used in a French proceeding like the contemplated criminal proceeding. In fact, I am aware of no credible legal principle under French law that would even allow a French court to prevent Mr. Koum, a foreign resident, from asserting legal claims pursuant to local laws in fora outside of France to pursue discovery from foreign custodians abroad.

6. Mr. Khan accurately states that the court held a hearing in the Supplier Proceedings on October 27, 2025. Khan Declaration ¶ 37. But he inaccurately suggests that Mr. Koum was properly served before that hearing. Mr. Koum was not properly served either at the location in France where service was attempted, or in California. This failure of service is another reason that the Supplier Proceedings will not succeed.

7. Separately, I note that Mr. Tessier's Supplier Proceedings severely undermine his arguments in his Motion. He argues that the evidence that Mr. Koum seeks in the Section 1782 Application is not really "for use" in the contemplated French Criminal Proceedings I discussed in my first declaration. Even were that the case (and it is not), the evidence Mr. Koum is seeking would *independently* be relevant to Mr. Koum's defenses in Mr. Tessier's own Supplier Proceedings—a currently pending civil case in the French courts. Specifically, evidence of Mr. Tessier's fraud would be probative of the lack of good faith basis supporting the Supplier Proceedings and the relevance and legality of Mr. Koum's communications with merchants to gather evidence of Mr. Tessier's misconduct.

## THE ARTICLE 145 ORDER

8. As noted in my declaration in support of the Section 1782 Application, Gibson, Dunn & Crutcher previously obtained an order from a French judge to conduct a search of Mr. Tessier's offices to obtain evidence that would help uncover his scheme. *See* Fender Decl. ¶ 9. This order (the "**Article 145 Order**"), issued under Article 145 of the Code of Civil Procedure on August 2, 2025, is civil in nature and was limited to the recovery of evidence

retained by Dernier Etage in Paris regarding two specific projects—the yachts Moonrise 1 and Moonrise 2.  Although that seizure may lead to evidence Mr. Koum will be able to submit in the French Criminal Proceeding, the Article 145 application was not made specifically to gather evidence for that proceeding and has nothing to do with the collection of evidence located outside of France.  The Article 145 Order *granting* a seizure order to recover documents in France in no way restricts or prevents the lawful collection of documents and testimony in the United States pursuant to 28 U.S.C. § 1782.

9. Mr. Khan's and Mr. Del Forno's descriptions of the Article 145 proceedings are inaccurate.  Mr. Del Forno states that the Paris Commercial Court "rejected the majority of Koum's application." Del Forno Declaration ¶ 27.  That is incorrect.  The Paris Commercial Court granted Mr. Koum substantial relief, including the seizure order he requested.  Mr. Khan—who is, again, not French qualified—claims the court "imposed" restrictions and limitations on execution of the order.  But the restriction he cites—a "provisional sequestration" (*séquestre provisoire*) of documents obtained pursuant to the Article 145 Order, pending a hearing on January 6, 2026—is standard.  It was included in the Order consistent with local practice and custom in Article 145 applications to ensure that collected materials are temporarily held in escrow pending review and sorting, rather than imposed in response to any opposition by Tessier.  Khan Declaration ¶ 33.  Nothing about this procedural safeguard restricts or prevents Mr. Koum's use of evidence lawfully obtained through other means, including discovery granted under 28 U.S.C. § 1782.

## THE ATTEMPTED MONACO TRANSFER

10. On September 13, 2025, Mr. Koum learned that Dernier Etage intended to sell its business assets to Octoplus SARL, a Monaco-based company funded and controlled by Mr. Tessier, which at that time was still in the process of incorporation.  Mr. Koum became

concerned that Mr. Tessier was attempting to transfer part or all of his assets outside of France to place them beyond the reach of creditors, including Mr. Koum's affiliated entities.

11. On September 15, 2025, we filed objections to this sale on behalf of Mr. Koum's affiliated entities (M1 Marine Holdings Ltd, M2 Marine Holdings Ltd, Mogambo Holdings Ltd, Immobiliare Management LLC, SB1 Holdings LLC, and SCI Maison Champ de Mars) (collectively, the "**Koum Entities**") with the Clerk of the Paris Commercial Court (*Greffe du Tribunal de commerce de Paris*) to prevent payment of the business transfer price putatively paid by Octoplus (again, wholly controlled by Tessier) to Dernier Etage. The filings were designed to ensure that the purchase price of Dernier Etage's business remained blocked pending resolution of ongoing disputes, including arbitration proceedings in the United Kingdom (the "**UK Arbitrations**").

12. On October 7, 2025, Dernier Etage moved to vacate Mr. Koum's objections and allow the transfer to continue. The Court held a consolidated hearing on October 10, 2025 and issued its order on November 7, 2025 (the "**Monaco Order**").

13. In the Monaco Order, the judge dismissed Dernier Etage's claims, and ordered costs paid to Mr. Koum. The Court held that any payment by Octoplus to Dernier Etage prior to the conclusion of the UK Arbitrations is unenforceable, effectively maintaining the block of the transfer of the sale price.

14. The Court's review was limited to whether the Koum Entities' claims were credible or pending, to justify the blockage. Nonetheless, the Court observed that "it appears from the numerous documents submitted for consideration that *the applicant* [Tessier] *may have overcharged for the resale of goods*" and that "several other proceedings have been brought both in the United States (petition under 28 U.S.C. § 1782 and order of 3 October 2025) and in France (order under Article 145 dated 31 July 2025—even if a retraction is

5

requested, it will be examined on 6 January 2026), with a view to establishing evidence." (emphasis added).

15. It remains our view that the attempted sale of RTD's assets to a still nascent corporation in Monaco constitutes a fraudulent conveyance intended to shield assets from enforcement. The court, while not ruling on that point, acted to preserve the status quo by prohibiting transfer of funds pending resolution of the underlying disputes.

## DESCHANEL CONTRACTS

16. Mr. Khan also extensively discusses contracts between Tessier and his companies and Mr. Koum and his companies related to a property in France, whereby Tessier agreed to supply professional services (the "**Deschanel Design Services Contract**") and act as client representative (the "**Deschanel Client Representative Contract**") for Mr. Koum's affiliated entity SCI Maison Champ De Mars. Khan Declaration ¶ 11(e); Colorado Declaration, Dkt. No 15, Exhibits 6, 7. Neither party has yet brought suit or arbitration pursuant to these agreements.

17. Mr. Khan asserts that there is an arbitration clause governing those agreements. Khan Declaration ¶¶ 14, 39. That is not fully accurate: only the Deschanel Design Services Contract includes a provision referring to arbitration in France. Dkt. No 15, Exhibit 6, Clause 11.7. The Deschanel Client Representative Contract contains no arbitration provision, and instead confers jurisdiction to French state courts. Dkt. No 15, Exhibit 7, Clause 10.

18. Mr. Khan appears to try to argue that these contracts, under which the parties have not yet sought to arbitrate or litigate, impose some sort of confidentiality obligation on Mr. Koum. Khan Declaration ¶ 39. It is unclear why Mr. Khan is competent to opine on the extent of confidentiality under French law. Regardless, the applicable arbitration clauses in no way suggest that they are exclusive of all other remedies: criminal proceedings like the French

6

Criminal Proceeding can include facts regarding conduct otherwise subject to an arbitration agreement.

### SCOPE OF DISCOVERY IN POTENTIAL FRENCH ARBITRATION

19. Based on my understanding of U.S. law, Mr. Khan is wrong when he asserts that Mr. Koum can obtain the same discovery as can be obtained through the Section 1782 Application, through the arbitral rules that would apply *if* the parties entered arbitration pursuant to the Deschanel Design Services Contract. Khan Declaration ¶¶ 39-41. Discovery under the applicable arbitral rules (the International Chamber of Commerce, or "**ICC" rules**) is strictly limited to documents that are (a) relevant and material to the issues before the tribunal, and (b) within the possession, custody, or control of a party. *See* ICC Rules of Arbitration (2021), Art. 25 and Appendix IV (d). The Secretariat's Guide to ICC Arbitration (2012), §3-948 specifies that full discovery as practiced in common law system is possible but rarely permitted in ICC arbitration . Discovery does not extend to third-party evidence or broader fact-finding across the parties' relationship. Therefore, I disagree with Mr. Khan's statement that the applicable arbitral rules provide "wide-ranging disclosure obligations." Khan Declaration ¶ 39(a). Those rules do not extend to third-party disclosure or general pre-hearing discovery.

20. Indeed, because none of the U.S. merchants or suppliers from whom evidence is sought under the Section 1782 Application are parties to the Deschanel Design Services Contract, they would not be parties to arbitration initiated under the dispute resolution clauses therein. The arbitral tribunal (if ever convened) would have no jurisdiction to compel disclosure from those non-parties.

### GENERAL DATA PROTECTION REGULATION

21. In his brief, Mr. Tessier also suggests that the Section 1782 Application implicates European Union's General Data Protection Regulation ("GDPR"). RTD Motion 18

n.3. Based on my review of the Section 1782 Application and the accompanying subpoenas, I understand the discovery sought concerns business records and communications maintained by U.S.-based merchants operating within the Southern District of New York, relating to their commercial dealings with RTD.

22. On that basis, it is my understanding that the GDPR does not govern this discovery. The Regulation governs the processing of "personal data" by entities located in the European Union, or, in limited circumstances, by entities outside the Union only insofar as they process personal data of individuals in the Union in connection with offering goods or services to, or monitoring the behavior of, such individuals. *See* GDPR, Art. 3(1)–(2). On the facts as I understand them, Mr. Koum is seeking solely commercial records and communications reflecting the actual cost or purchase price RTD paid to merchants—not any "personal data" within the meaning of the GDPR.

*   *   *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 12, 2025

Location: Paris, France

Pierre-Emmanuel Fender