## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Application of JAN KOUM, for an
Order  Pursuant to 28 U.S.C. § 1782 to
Conduct Discovery for Use in a Foreign
Criminal Proceeding Against Remi Tessier
and DE SARL.

No.: 1:25-mc-00428-JPO

## DECLARATION OF HASSAN KHAN IN SUPPORT OF MOTION

I, Hassan Khan, declare pursuant to 28 U.S.C. § 1746:

1.  I am an attorney qualified as a Solicitor of the Senior Courts of England and Wales since 1994. I am a Partner at The Khan Partnership LLP ("**TKP**"), a law firm based in London, United Kingdom, regulated by the Solicitors Regulation Authority of England and Wales. TKP is instructed to act for Mr Remi Tessier ("**Tessier**") and Dernier Etage SARL ("**DE**") in their commercial disputes against Jan Koum ("**Koum**") and various affiliated companies. I am authorised by Tessier and DE to make this Declaration in support of the Motion, dated October 28, 2025, to intervene, vacate the Court's October 3 Order, and dismiss the Petition filed with this Court by Koum on September 29, 2025.

2.  Except where I indicate to the contrary, the facts and matters in this Declaration are within my own knowledge, on the basis of documents and instructions provided by Tessier and by DE pursuant to their instruction of TKP. Nothing in this Declaration waives or is intended to waive the attorney-client privilege between and among TKP, DE, Tessier and their legal team.

1

**Introduction**

3.  Since starting business in 1988, Tessier has become highly regarded and sought after across his exclusive, ultra-high-net-worth clientele for his works on clients' high-end renovation and refurbishment projects for large yachts, private aircraft and luxury residences. Tessier's bespoke services cover the complete provision of design and decoration services for these luxury projects. The confidential network and specialist contacts established by DE and Tessier during his 37 years of professional activity in decoration, design and luxury goods markets are strictly commercially confidential. Tessier and DE provide a highly bespoke and customised service based on an excellent reputation and decades of specialist knowledge, to a discerning clientele who value discretion.

4.  Koum's Application to this Court on September 29, 2025 ("**1782 Discovery Application**") arises following the breakdown of a successful and mutually beneficial professional commercial relationship between Tessier as designer, and Koum, for Tessier's design services for several of Koum's projects. Having been repeatedly denied payment of outstanding invoices totalling €1.2 million, Tessier pursued their recovery by commencing Arbitration proceedings in London before the London Maritime Arbitrators Association ("**LMAA**") and the English Chartered Institute of Arbitrators ("**CIARB**") on July 3 and 4, 2025 pursuant to the parties' contractually agreed dispute resolution mechanism.

5.  In addition, Tessier obtained a precautionary seizure of Koum's superyacht (Moonrise 2) by Order dated July 3, 2025 of the Rotterdam District Court in the Netherlands.

6.  Against this background, despite the contractual relationship being governed by English law and subject to ongoing binding confidential arbitration, Koum has launched a full-

scale, multi-jurisdictional campaign to attack Tessier's name, brand, and reputation and improperly obtain access to Tessier's commercially confidential business information and know how.

7.    The 1782 Discovery Application was filed on the same day Koum's affiliated company called Immobiliare Management LLC filed wide-ranging similar allegations in its defence and counterclaims in confidential English arbitration proceedings before the CIARB.  The allegations there and in the 1782 Discovery Application are strikingly similar and are summarized below for the Court's information in a limited way given the arbitration proceedings are confidential and there are limited exceptions for disclosure, including in Court proceedings.

8.    As part of the attempts to undermine Tessier's reputation and goodwill, the retributive allegations made in the 1782 Discovery Application were also published in detailed articles by leading international news media outlets, some within hours, of Koum's filing of the 1782 Discovery Application.  The first publisher, a leading English news outlet based in the United Kingdom, did not approach Tessier for comment before their publication.  I believe one or more of the recipients of the subpoenas in New York issued as a result of the 1782 Discovery Application and Court's October 3 Order learned of this Application not by the Court's Order dated October 3, but from the referenced international news articles published on September 29 and thereafter.

9.    This Declaration addresses:

   a.   The contractual basis of the commercial relationship between Tessier and Koum, expressly agreed

through their respective affiliated companies;

b.  The two arbitral proceedings already underway in England since 3 and 4 July. The 1782 Discovery Application appears to be part of an attempt to circumvent:

c.  The clear, established procedures of each arbitral tribunal as to evidence, discovery and disclosure that should properly be only within those proceedings; and

d.  The binding confidentiality applicable to those arbitration proceedings and discovery therein;

e.  The binding arbitration clause applicable to any dispute arising out of works carried out by Tessier on Koum's real estate property in Paris;

f.  The characterisation in the 1782 Discovery Application of Tessier's and Koum's commercial relationship as one of 'mutual interest, trust and confidence,' which is a mischaracterisation and unsustainable under English law; and

g.  The attempts by Koum to cause further damage to Tessier by:

h.   Laundering allegations through the media in order defame Tessier under the cloak of qualified privilege available in reporting these Court proceedings;

i.   Unlawful deception by Koum and his representatives to Tessier's confidential industry contacts. This includes impersonations and false representations made by Koum's representatives to be a representative of Tessier in an effort to get private and confidential information they know they have no legal right to get; and

j.   Attempts by Koum and his representatives to cause third party breaches by Tessier's suppliers of confidentiality by offering them compensation to turn over commercially confidential documents and information they are legally not entitled to.

## Contractual Relationship between DE and affiliated companies of Koum

10.   Koum owns and carries out business operations and asset dealings through, inter alia, the following companies:

a.   Immobiliare Management LLC ("**Immobiliare**"), a California limited liability company, which, through various subsidiaries, holds real estate, including a

10048739

number of Koum's residences in California to which Tessier provided design and procurement services;

b. M1 Marine Holdings Ltd (formerly P099 Holdings Ltd) ("**M1 Marine**"), a Cayman Islands corporation which owns the superyacht Moonrise 1;

c. M2 Marine Holdings Ltd ("**M2 Marine**"), a Cayman Islands corporation which owns the superyacht named Moonrise 2; and

d. SCI Maison Champ de Mars, a société civile immobilière (*i.e.*, a specialist French company constituted for the ownership and management of real estate), which owns the "Deschanel" real estate property at 2 Avenue Emile Deschanel 75007, Paris, France.

11.    The basis upon which Tessier, through DE, provided design services, was;

a. In respect of Tessier's design services for the 95 Fleur Property referred to in the Colorado Decl. as Ex. 1 (ECF No. 15-1), an Agreement for the Supply of Professional Services between Immobiliare and DE dated 15 December 2015 (id.) ("**the 95 Fleur Contract**");

10048739

b.  In respect of Tessier's design services for Moonrise 1, an Agreement for the Supply of Professional Services between M1 Marine (then known as P099 Holdings Ltd) and DE dated 16 July 2016 (Ex. 2 of Colorado's Decl., ECF No. 15-2) ("**the Moonrise 1 Contract**");

c.  In respect of Tessier's design services for the Malibu Property, the Four Seasons Property, and the St Barts Property, an Addendum to the 95 Fleur Contract (ECF No. 15-4) ("**Addendum**");

d.  In respect of Tessier's design services for Moonrise 2, an Agreement for the Supply of Professional Services between M2 Marine and DE dated 31 August 2021 (ECF No. 15-5) ("**the Moonrise 2 Contract**"); and

e.  In respect of Tessier's design services to the Deschanel Property, an Agreement for the Supply of Professional Services ("**the Deschanel Services Agreement**") and Client Representative Contract between SCI Maison Champ de Mars and DE dated 16 December 2021 (ECF Nos. 15-6 and 15-7) ("**the**

10048739

**Deschanel Client Representative Contract**")
(together, "**the Deschanel Contracts**").

12.    In each project, the parties contractually agreed to a binding dispute resolution mechanism through confidential arbitration for any disputes in respect of the services provided;

    a.    Section 11.6 of the 95 Fleur Contract (also adopted in the Addendum) states if a contractual dispute arises, which cannot be resolved by discussions between the parties, "*either party may refer the matter to confidential arbitration by a single arbitrator with no less than ten years' experience of handling luxury home development disputes appointed by agreement or (in default) nominated on the application of either party by the President for the time being of the [English] Chartered Institute of Arbitrators… The seat of the arbitration shall be England. The decision of the arbitrator shall be final and binding on the parties.*"

    b.    Section 12.7 of both the Moonrise 1 Contract and the Moonrise 2 Contract each mandate that "*all disputes arising under or in connection with this Agreement shall be referred to arbitration in London… conducted in accordance with… London Maritime*

10048739

Arbitration Association (LMAA) procedures applicable."

  c. Section 11.6 of the Deschanel Client Representative Contract and the Deschanel Services Agreement mandate that if a dispute in connection with the contract or services cannot be resolved by discussions between the parties, "*either party may refer the matter to confidential arbitration by a single arbitrator with no less than ten years' experience of handling luxury home development disputes appointed by agreement or (in default) nominated on the application of either party by the President of the judicial court of Paris… The arbitration shall be covered by the rules of Arbitration of the International Chamber of Commerce… the seat of the arbitration shall be France.*"

13. The governing law between the parties, except for the Deschanel Contracts, is English law and they agreed to submit to the jurisdiction of England in their dealings for example within:

  a. Clause 11.7 of the 95 Fleur Contract (also adopted by the Addendum);

b.  Clause 12.8 of the Moonrise 1 Contract; and

c.  Clause 12.8 of the Moonrise 2 Contract.

14.  The parties to the Deschanel Contracts are under jurisdiction of the International Chamber of Commerce ("**ICC**") with the seat of arbitration to be Paris, applying French law (Section 10 of the Deschanel Services Agreement and Sections 11.6 and 11.7 of the Deschanel Client Representative Contract).

**Arbitral Proceedings in England**

15.  Under the parties' binding dispute resolution mechanism, Tessier through DE commenced two separate arbitration proceedings in England:

a.  On July 4, 2025, arbitration proceedings were commenced against Immobiliare pursuant to the 95 Fleur Contract and Addendum, under the English Arbitration Act 1996 and the Controlled Costs Rules of the CIARB, under the governing law of England (the "**Immobiliare Proceedings**"); and

b.  On July 3, 2025, arbitration proceedings were commenced against M2 Marine pursuant to the Moonrise 2 Contract, under the rules of the LMAA under the governing law of England (the "**M2 Marine Proceedings**").

16.  Generally, documents and material created for the purpose of arbitral proceedings

10

governed by English law are confidential, subject to a number of limited exceptions. These include where disclosure is reasonably necessary for use in Court proceedings. I do not exhibit copies of submissions, correspondence, or documents exchanged between the parties in the arbitral proceedings. The fact that arbitral proceedings are underway is not confidential. I note that the factual allegations by Koum's affiliated companies in the arbitration are also those set out by Koum in the 1782 Discovery Application.

### (a) The Immobiliare Proceedings

17.    On July 4, 2025, HFW LLP on behalf of DE commenced the arbitration seeking wide-ranging relief, the subject matter of which is largely similar to the allegations raised by Koum in the 1782 Discovery Application and raised by both Koum and Tessier / DE in the French court proceedings.

18.    Gibson Dunn & Crutcher LLP ("**Gibson Dunn**") responded on July 26. They disputed the CIARB Tribunal's jurisdiction. The parties agreed on August 29, 2025 to the Appointment of an arbitrator to the Immobiliare Proceedings, without prejudice to Immobiliare's procedural challenge.

19.     HFW on behalf of DE responded by Submissions dated September 8, 2025.

20.    The parties now await directions from the arbitral tribunal as to case management of the Immobiliare Proceedings. The parties contractually agreed for disputes to be resolved by binding arbitration in England, with the Arbitrator's decision to be "*final and binding on the parties*".

### (b) The M2 Marine Proceedings

21.     On July 3, 2025, DE commenced arbitration under LMAA Terms following a dispute between DE and M2 Marine as to unpaid invoices. DE's Claim Submissions were filed on September 1, 2025; M2 Marine filed its Defence and Counterclaim on September 29, 2025.

22.     There is very significant duplication in the disputed allegations made by Sara Colorado (ECF NO. 15) in the 1782 Discovery Application and the Defence and Counterclaim filed by M2 Marine on September 29, 2025. Both were filed in the same day in this Court and in the LMAA Arbitration by Gibson Dunn, who represent both Koum and his affiliated companies.

### Attempts to Circumvent UK Arbitral Proceedings by Koum

23.     The timing and the basis of the 1782 Discovery Application is notable in the wider picture of Koum's and his companies' aggressive litigation tactics;

    a.  In the Immobiliare Proceedings, DE has already notified it seeks wide-ranging declarations from the arbitral tribunal. This mirrors, to some extent, the summons issued by Tessier and DE in the French Court on October 2.

    b.  In the M2 Marine Proceedings, Koum's legal team (Gibson Dunn) simultaneously filed the Defence and Counterclaim from M2 Marine, and the 1782 Discovery Application on the same day relying upon

12

the same facts and subject matter.

c. Within mere hours of the 1782 Discovery
Application and the M2 Marine Defence each being
filed, the Daily Mail in the United Kingdom, a
leading online and print media newspaper, published
a negative story about Tessier and DE ostensibly on
the basis of the 1782 Discovery Application, set out
further below. (A true copy of the published story is
annexed as Ex. 1).

24.    A central aim of the 1782 Discovery Application appears to be for Koum to seek evidence
outside of the strict confidentiality obligations of the arbitration, and to malign Tessier by
publicly disseminating accusatorial information, notwithstanding the Arbitration
proceedings are subject to strict duties of confidentiality.

*Evidence requested before this Court can be obtained in the ongoing UK Arbitration Proceedings*

25.    The 2015 Arbitration Rules of the CIARB provide clear procedural rules which allow
Immobiliare (and therefore, Koum) to obtain discovery evidence and documentation in the
normal course of the arbitration. For example:

a. Under Article 27(1): "*Each party shall have the
burden of proving the facts relied on to support its
claim or defence.*" DE will therefore be required to

adduce evidence required to support its position and Immobiliare and Koum will have the opportunity to examine that evidence.

b. Under Article 27(3): "*At any time during the arbitral proceedings the arbitral tribunal may require the parties to produce documents, exhibits or other evidence within such a period of time as the arbitral tribunal shall determine.*"

c. Under Article 26(2) and 26(3):

i. "*The arbitral tribunal may, at the request of a party, grant interim measures.*"

ii. "*An interim measure is any temporary measure by which, at any time prior to the issuance of the award by which the dispute is finally decided, the arbitral tribunal orders a party, for example and without limitation, to… d) preserve evidence that may be relevant and material to the resolution of the dispute.*"

26. Under the 2021 Terms of the LMAA (applying to the M2 Marine Proceedings):

a. Paragraph 8 of the Second Schedule provides that: "*If a party wishes to obtain disclosure of certain*

*documents prior to service of submissions, it must seek the agreement of the other party, failing which it should make an appropriate written application to the tribunal, explaining the rival positions of the parties in question.*"

    b.    At Paragraph 9 of the Second Schedule: "*Subject to any specific agreement between the parties or ruling from the tribunal, the parties are entitled at any stage to ask each other for any documentation that they consider to be relevant which has not previously been disclosed. Parties will not generally be required to provide broader disclosure than is required by the courts. Generally, a party will only be required to disclose the documents on which it relies or which adversely affect its own case, as well as documents which either support or affect the other party's case.*"

27.    More widely, under the Arbitration Act 1996 (which applies to all arbitrations governed by English law):

    a.    At section 38(4): *The tribunal may direct that a party or witness shall be examined on oath or affirmation, and may for that purpose administer*

15

10048739

*any necessary oath or take any necessary affirmation.*

b. At section 43(1): *A party to arbitral proceedings may use the same court procedures as are available in relation to legal proceedings to secure the attendance before the tribunal of a witness in order to give oral testimony or to produce documents or other material evidence.*

c. At section 44(1), if the arbitral tribunal is unable to grant such order: *Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making orders (whether in relation to a party or any other person) about the matters listed below [which include the taking of the evidence of witnesses and the preservation of evidence] as it has for the purposes of and in relation to legal proceedings.*

28.    Therefore, both the Immobiliare Proceedings and the M2 Marine Proceedings are governed by arbitration rules reinforced by established legislation giving complementary powers to the Courts and Tribunals that provide clear, binding and wide-ranging mechanisms for the exchange of evidence and wider procurement of documents. Applications for evidence against third parties can clearly be ordered by an arbitral tribunal where necessary, and

16

recourse can be had to the English Courts. If Immobiliare or Koum are concerned further evidence is required, there is therefore already a clear and established arbitral mechanism, supported by the English Courts, by which it can request the respective Tribunal's intervention and imposition of wide measures to seek such documents, including third party orders.

### *Confidentiality of Arbitration Proceedings*

29.     As noted in the contractual clauses above, the parties agreed any disputes as to the terms of the Contract would be resolved by way of "*confidential arbitration*". Further, if the parties are bound by confidentiality, as a matter of English law, the default rule is that the parties to an arbitration agreement are taken to have impliedly agreed to an obligation of confidentiality, implied both from the nature of arbitration, and a substantive rule of arbitration law taken as an implied term (this was re-emphasised by the English Court of Appeal is *Emmott v Michael Wilson & Partners* [2008] EWCA Civ 184, paragraphs [81], [84], [85] and [106]).

### **Circumvention of Ongoing French Proceedings**

30.     There are also ongoing civil litigation proceedings between these parties in France.

31.     On July 31, 2025, Koum (through his companies, Immobiliare, M1 Marine and M2 Marine) made an ex parte discovery application seeking an order of the French Court to obtain evidence to access accounting records for Koum's projects. That request was granted ex parte by the French Court on August 2, 2025, but despite Koum asking the French Court to treat the Application as urgent, Koum's lawyers did not serve the Order for six weeks.

The Court in Paris also substantially narrowed the scope of the search and limited it to only those documents which pertain to Moonrise I and Moonrise II, as opposed to Koum's overbroad initial request which pertained to all DE projects, but that was considered too broad by the French Court and disclosure was therefore restricted.

32.   On September 15, Koum's representatives and an appointed bailiff attended DE's offices to carry out the search for those documents.

33.   Koum's application was opposed and challenged by DE on October 7, 2025, and the relevant documents have been sequestered by the French Court pending further order.  As a result, Koum and his representatives cannot access the seized documents. A hearing is scheduled in Paris on January 6, 2026, to determine the matter. The French Court rejected Koum's request for urgency to determine the issues sooner.. The 1782 Discovery Application is obviously an attempt to circumvent the restrictions and limitations imposed by the French Court.

34.   Koum's retributive campaign has also involved circulating unfounded and damaging allegations against DE to its suppliers. Those requests included letters by Gibson Dunn, signed by or on behalf of Orin Snyder of their New York Office, making demands for disclosure of economic and commercial documents and information, against threats of worldwide litigation. These requests made by a foreign law firm to French nationals were aggressive, intended to intimidate and, I am informed by DE's French Counsel, likely violated international agreements and treaties.  Such acts were taken in breach of the French Blocking Statute (Article 1 bis of Law No. 68-678 of July 26, 1968) which prohibits the direct disclosure of such information under penalty of criminal sanctions.

35.    The receipt of the Snyder letters was reported by DE and Tessier to the French Strategic Information and Economic Security Service on July 9  (A true copy of this is annexed hereto as Ex. 2) and they also raised this matter with the French Court on October 27, 2025 making a particular emphasis on the fact that these letters threatened legal action if co-operation from the suppliers by way of providing confidential commercial documentation, was not forthcoming.

36.    As a result of this ongoing unlawful smear campaign, Tessier and DE issued urgent summary proceedings in France on October 2, 2025, a day before this Court issued its ex parte order on October 3 in this 1782 proceeding, seeking an order from the French Court that Koum be prevented from further engaging in a harmful and offensive campaign with the intention of harming DE's reputation, and that he be prevented from further requesting confidential information or commercially sensitive documents to which he / his companies are not entitled, from DE's suppliers. This mirrors steps being taken in the English arbitration. To date, Koum's representatives continue to contact DE's suppliers.

37.    A hearing took place on October 27, 2025 given the urgency of this matter. The French Court has confirmed it will issue its judgement regarding Koum's and his lawyers' actions on December 3rd.   Despite orchestrating an aggressive and wide ranging multi-jurisdictional campaign on Koum's behalf, Gibson Dunn -- appearing for Koum before the French Court on October 27 --inexplicably represented to the French Court that effective service on Koum had not been achieved despite service having been made  to the designated address Koum provided for the purposes of legal proceedings.

38.    In addition to the above, also on 15 September 2025, Koum opposed DE's transfer of part

of its business to a Monaco-based company. That opposition is also being challenged separately in the French Court.

39.    There is also binding contractual dispute mechanisms in France pertaining to numerous outstanding invoices relating to Koum's projects in Paris. Yet, Koum still seeks DE's services (notwithstanding the active legal proceedings in the United Kingdom, France and the United States and Koum's smear campaign) without payment. Even as late as July 29, Koum was still requesting that Tessier and DE continue doing work for his benefit.

    a.   As to the project disputes in Paris, confidential arbitration is again the agreed forum for dispute resolution. The ICC's 2021 Arbitration Rules expressly provide for wide-ranging disclosure obligations, including as follows: Article 25(4) of the ICC Rules provides that "*at any time during the proceedings, the arbitral tribunal may summon any party to provide additional evidence*."

    b.   Article 28(1) and 28(2) of the ICC Rules make provision for the arbitral tribunal to order any interim or conservatory measure it deems appropriate, or for either party to request such interim or conservatory measure.

40.    The ICC Rules also expressly state that documents disclosed shall be confidential (Article 1(4) of Appendix II of the Confidential Character of the Work of the International Court of

Arbitration, and Article 8 of the Appendix I to the ICC Rules). They also make provision for either party to request an order of the tribunal concerning the confidentiality of the arbitration proceedings to protect trade secrets and confidential information.

41.    In light of the above mechanisms in the United Kingdom and in France, Koum is readily able to obtain discovery in the ongoing UK arbitrations, and in a French arbitration under ICC Rules.  In each instance, there are established, clear, and wide ranging abilities to obtain an order of the Tribunal to, if necessary, seek specific evidence from DE and third parties as needed. Against these procedural backgrounds, extensive arbitral mechanisms, there seems no reason except to circumvent confidentiality mandates.

42.    There is no reason for Koum to seek a discovery order from in this Court except perhaps to circumvent the confidentiality mandates that would preclude Koum from relying on those documents for ulterior motives such as adverse media campaigns and to aggressively undermine Tessier and DE's commercial reputation.

## Relationship of Mutual Interest, Trust and Confidence

43.    The 1782 Discovery Application is largely based on the underlying general assertion that Tessier acted for Koum within a *"fruitful and trusting"* relationship in which Tessier was "*acting as a trusted advisor*" and Koum "*reasonably believed that Tessier would act in their mutual best interest"* (p. 8-9 of the Memo. of Law; ¶¶ 14-15 of Colorado Decl. (ECF No. 15)).This is misleading.  The manner by which Tessier provided design services was governed by commercial contracts between DE and the relevant company for Koum's projects. The exaggerated suggestion that Koum, a billionaire, single-mindedly, without independent consideration, submitted to and followed every recommendation and piece of

21

advice that Tessier may have proposed is not correct. For example, I am instructed Koum separately engaged specialist art and design advisors across the years to advise him. Tessier was informed by Koum that New York based art consultant Sandy Heller advised Koum on fine art purchases for Koum. The 1782 Discovery Application does not disclose to the Court that Koum retained and relied on dedicated professional advisors in specific areas such as art purchases and instead attempts to assert an unparticularised wide-ranging duty against Tessier which is unsupportable in law or fact.

44.    The relationship between Koum and Tessier was a commercial, business to business relationship. Koum engaged Tessier's services through each of their respective companies, each maintaining legal independence and acting in their own commercial interests. The commercial, business to business nature of their relationship is confirmed within the various contracts between DE and Koum's companies. For example:

      a.    Under Clause 6.1 of the 95 Fleur Contract, the parties agreed, "*During the Term the Designer shall be an independent contractor and not a servant of the Client*";

      b.    Under Clause 6.1 of the Moonrise 1 Contract, the parties agreed, "*During the Term the Designer shall be an independent contractor and not a partner, co-venturer, or agent of the Client*".

      c.    Under Clause 6.1 of the Moonrise 2 Contract, the parties agreed, "*During the Term the Designer shall*

> *be an independent contractor and not a partner, co-venturer, or agent of the Client"*.

> d.  Under Clause 6.1 of the Deschanel Contract, the parties agreed, *"During the Term the Designer shall be an independent contractor and not a servant of the Client"*;

45.  Given the clear and binding contractual relationship under English law (which is the law underlying the basis for the parties' dealings), Courts and Tribunals are very reticent to accept that a fiduciary relationship could be implied. Recently, the English Supreme Court laid down clear and binding guidance on this point in *Hopcroft and ors v Close Brothers Limited* [2025] UKSC 33, that:

> a.  *"It is normally inappropriate to expect a commercial party to subordinate its own interests to those of another commercial party"*

> b.  "*A commercial transaction or arrangement, in which <u>one party has a personal financial interest, known or apparent to the other party</u>, in bringing the transaction into fruition, <u>is not one in which an undertaking of undivided loyalty and altruism can readily be implied</u> into a contract or such a duty recognised by equity*"

c. "The *existence, in a commercial context, of trust and confidence between parties to a transaction is not of itself sufficient* for equity to impose fiduciary duties on one of the parties towards the other. ... trust and confidence arise in arm's length commercial relationships in which there is no suggestion of one party owing the other any fiduciary obligations."

d. "The *relationship of trust and confidence is the consequence, and not the cause, of a fiduciary duty*. The fiduciary duty exists because the fiduciary has undertaken not to pursue his own interests... It is because *the fiduciary has undertaken to act solely in the best interests of the principal*, and the latter trusts the fiduciary to do so, in a situation where it is usually possible for the fiduciary to act in a self-interested way, that the vulnerability typically arises."

e. "There must be the assumption of responsibility by the fiduciary to act exclusively on behalf of the other in the conduct of the other's affairs."

f. The fact that one party might advise another party is also not sufficient to imply fiduciary duties: "*The*

24

> *sales assistant in advising a customer on the attractiveness of a garment, or the wine waiter in advising the diner on the suitability of a wine with a meal, addresses the interests of the customer or diner without taking on a duty to act exclusively in the other's interests."*

**Bad Faith Attempts by Koum to Cause Further Damage to Tessier and DE**

**Laundering Allegations through the Cloak of Qualified Privilege in Court Proceedings**

46.  Koum's 1782 Discovery Application appears part of an attempt to hurl harmful and untrue allegations, which would have otherwise been the subject matter of confidential arbitration, and which, if made publicly, he knows would result in defamation proceedings.

47.  Under English law, this conduct is impermissible. In *R (Mohamed) v Secretary of State for Foreign and Commonwealth Affairs (No2)* [2011] QB 218, the then Lord Chief Justice, Lord Judge, explained at para [41]:

> *'It is, of course, elementary that <u>the courts do not function in order to provide the media with copy, or to provide ammunition for the media, or for that matter private individuals, to berate... anyone else</u>. They function to enable justice to be done between parties.'*

48.  As noted above, within mere hours of the Petition being filed on September 29, 2025 at 7:10PM EST on the same day, the Daily Mail published a detailed article, directly citing various extracts from the Petition and summarising Koum's allegations at length. Tessier

was provided no opportunity to comment prior to publication. It is likely no coincidence that Koum and his representatives immediately sought to involve the Daily Mail, said to be "*Britain's best-selling print newspaper seven days a week*" with "*more than a quarter of a million digital subscribers*" as of March 2025 (Ex. [https://www.dailymail.co.uk/news/article-14532887/Daily-Mail-million-digital-subscribers.html]), and 10.4 million daily website visits from 4.5 million monthly unique visitors (Ex. [https://www.hurstmediacompany.co.uk/mail-online-profile/]). The damage to Tessier was instant and severe with no media editorial balance and no abiding by the numerous applicable duties of confidentiality arising from the parties binding contract terms and confidential arbitration proceedings. According to SimilarWeb (September 2025 traffic for dailymail.co.uk), the total number of visits to the Daily Mail was 213.6 million for September 2025 globally, of which the UK accounted for 38.27%. See https://www.similarweb.com/website/dailymail.co.uk/#traffic (last visited October 27, 2025).

### Deception of Third Parties to Improperly Gain Confidential Information by Koum

49.     Tessier and DE have become aware that Koum, through his Counsel and/or employees, have been repeatedly contacting DE's suppliers in an attempt to extract commercially sensitive and confidential documentation and invoices to which they should know they are not legally entitled.

50.     In doing so, on various occasions, Koum's employees have falsely and unlawfully represented themselves as employees of DE / Tessier's Design Agency ("**l'Agence Rémi Tessier**") to improperly and unlawfully extract supplier information. This impersonation

was conducted in bad faith, with the intention of deceiving suppliers to provide commercially confidential information, illicitly gain an unfair advantage, and obtain documents to which Koum is not entitled (except by the lawful discovery process, noted above) on the false, misleading basis they are employees of DE with whom the supplier has a contract.

51.     By way of example, on June 23, 2025, one of DE's suppliers, Mr Bernardaud, received a telephone call from a Caroline Koenig of Immobilaire, who introduced herself *"as from another department of the Rémi Tessier Agency"*, and asked for a copy of a quote to verify goods supplied.  She then followed up with an email, a true copy of which is annexed as Ex. 3. This conduct was misleading, dishonest and deceitful. Another instance of unlawful impersonation was reported by another of DE's suppliers, Puiforcat Orfèvre, on October 8 (Ex. 4), where the same named individual, Caroline Koenig, contacted the supplier representing herself to be contacting them on behalf of the Rémi Tessier Agency, requesting copies of invoices on behalf of Tessier. This was again false.

52.     By way of further example, DE received notification on July 24, 2025 from another supplier that they had received a legal letter from Gibson Dunn on behalf of Koum, on July 14, 2025 (Ex. 5), threatening legal action on a "worldwide basis" unless documents and cooperation were forthcoming from the suppliers. Given the threatening tone of that letter, the supplier felt compelled to attend a Zoom call with Gibson Dunn, which took place on July 16, 2025, to discuss the content of the letter. During that Zoom call, when the supplier explained that it could not provide the information and documentation requested due to confidentiality obligations, Gibson Dunn indicated that their client, Koum, would be willing to provide "*compensation in exchange for cooperation*". Offering payment for the

provision of unlawfully obtained documentation is also unlawful.

53.    In any event, threats by Gibson Dunn of legal action by Koum against suppliers are improper in circumstances where there is no legal or contractual relationship between the supplier and Koum (or his companies) which would support such legal action in the event their requested disclosure were not forthcoming.

**Confidentiality of Subject Matter**

54.    The subject matter which Koum seeks in the 1782 Discovery Application are plainly trade secrets, and subject to confidentiality between respective merchants, suppliers and trade partners. Disclosure of such private information would reveal customers, pricing, distribution, buying habits, and non-public relationships, all of which have no nexus to Koum, and which are of instrumental value to Tessier's business and livelihood. Where such disclosure is required to be properly produced, it must take place within the confidential and lawful arbitration mechanisms already contractually agreed between the parties to which they are bound.

55.    Further, to my knowledge, based on communications with Tessier and his French Counsel as of today's date, Koum has not filed a French criminal complaint accepted by any investigative authority.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Nothing in the foregoing should be taken as a waiver of legal professional privilege or litigation privilege by Tessier or DE beyond the contents of this declaration.

10048739

DATED:  London, England

      October 28, 2025

 

_____

Hassan Khan

10048739